**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF ANN ARBOR RETIREE HEALTH CARE BENEFIT PLAN & TRUST, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ZOETIS INC., KRISTIN PECK, WETTENY JOSEPH, AND JAMIE BRANNAN,<br><br>Defendants. | No. 1:26-cv-04401-JGK<br><br>Judge John G. Koeltl<br><br><u>CLASS ACTION</u> |

**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**


I. SUMMARY OF THE ACTION ..... 2

A. Zoetis's Business ..... 4

B. Leading into the Class Period, Zoetis Faced Declining Demand from Increased Competition and Adverse Side Effects ..... 5

C. Internally, Defendants Knew that Demand Was Slowing ..... 6

D. Defendants Had Significant Cash Bonuses Tied to 2025 Revenue ..... 8

E. Defendants Resorted to an Undisclosed and Unsustainable Scheme to Mask Declining Demand ..... 9

F. Defendants Made False and Misleading Statements That Hid Zoetis's Falling Demand ..... 11

G. Demand Continued Declining as Defendants Engaged in More Manipulative Business Practices ..... 12

H. The Truth Started to Emerge While Defendants Continued to Mislead Investors ..... 13

1. August 5, 2025 – The Truth Started to be Revealed, but Defendants Continued to Mislead Investors ..... 13

2. Whistleblowers Led to Internal Investigation into Unsustainable Pull Forwards ..... 15

3. November 4, 2025 – The Truth Is Partially Revealed as Defendants Continued Misleading Investors ..... 15

4. Defendants Hit 2025 Revenue Benchmarks While They Continued to Falsely State That Demand Was Strong ..... 17

I. May 7, 2026 – The Full Truth Is Revealed ..... 18

II. JURISDICTION AND VENUE ..... 19

III. PARTIES ..... 20

A. Plaintiffs ..... 20

B. Defendants ..... 21

1. Corporate Defendant ........ 21

2. Individual Defendants ........ 22

C. Relevant Third Parties ........ 24

IV. SUBSTANTIVE ALLEGATIONS ........ 25

A. Relevant Background ........ 25

1. Zoetis's Business ........ 25

2. Zoetis's Distributors Are Its Primary Sales Channel ........ 26

3. Zoetis's Flagship Products Drive Its Revenue ........ 27

4. The Individual Defendants' Compensation Was Tied to Zoetis's Revenue ........ 29

B. Leading Up to the Class Period, Zoetis Announced a Revolutionary New Flagship Product ........ 30

C. Demand For Zoetis's Products Collapsed in 2024 Before the Class Period ........ 30

1. Librela's Reported Side Effects Reduced Demand for the Drug ........ 31

2. Competitors Launched New Products ........ 32

3. Defendants Knew Demand for Zoetis's Most Important Drugs Plummeted ........ 33

D. Defendants Resorted to Undisclosed and Unsustainable Sales Practices to Mask Declining Demand and Sales ........ 35

1. The Individual Defendants Refused to Truthfully Disclose Lower Demand ........ 36

2. The Individual Defendants Hid Lower Demand Through Undisclosed, Manipulative Business Practices ........ 38

3. Defendants' Manipulative Sales Practices Were Unsustainable ........ 39

E. The Class Period Begins and Defendants Mislead Investors by Claiming Sales Are a Result of Strong Demand While Hiding Zoetis's Unsustainable Sales Practices ........ 41

F. Pull-Forwards Continued to Ramp up Through June and July 2025 ........ 44

G. The Truth Began to Be Revealed While Defendants Continued to Hide the Full Extent of Their Fraud ... 45

H. The Scheme Began to Unravel, Leading the Company to Cut Guidance During Its Q3 2025 Earnings Release ... 47

I. Defendants Continued Misleading Investors ... 48

J. Whistleblowers' Warnings Led to a KPMG Investigation ... 50

K. The Company Reported Full Year Results, Hitting the Revenue Benchmarks While Continuing to Mislead Investors About Demand ... 50

L. The Full Truth Is Revealed ... 52

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ... 54

A. January 14, 2025 – J.P. Morgan Healthcare Conference ... 54

B. February 13, 2025 – Q4 2024 Earnings Call ... 56

C. February 27, 2025 – BofA Securities Animal Health Summit ... 58

D. May 6, 2025 – Q1 2025 Earnings Call ... 59

E. May 7, 2025 – CNBC Interview ... 60

F. May 29, 2025 – Stifel Jaws & Paws Conference ... 61

G. August 5, 2025 – Q2 2025 Earnings Call ... 62

H. September 8, 2025 – Morgan Stanley Global Healthcare Conference ... 65

I. November 4, 2025 – Q3 2025 Earnings Call ... 66

J. February 12, 2026 – Q4 2025 Earnings Call ... 67

VI. LOSS CAUSATION/ECONOMIC LOSS ... 68

A. August 5, 2025 – First Partial Corrective Disclosure/Materialization of the Risk ... 70

B. November 4, 2025 – Second Partial Corrective Disclosure/Materialization of the Risk ... 72

C. May 7, 2026 – Final Corrective Disclosure/Materialization of the Risk ... 75

VII. ADDITIONAL INDICIA OF SCIENTER ... 77

A. Former Employees Confirm Defendants Reviewed Information Contrary to Their Public Statements ........ 77

B. The Individual Defendants Acted With Scienter Because They Directed The Manipulative Business Practices ........ 80

C. The Individual Defendants Closely Monitored Product Demand, Competition, and Inventory Levels for Each Product and Distribution Channel ........ 82

D. The Sales of Simparica, Apoquel, Cytopoint, and Librela Were Critical to Zoetis's Financial Success and Market Share ........ 83

E. The Individual Defendants' Executive Compensation Plans Support an Inference of Scienter ........ 84

VIII. CLASS ACTION ALLEGATIONS ........ 87

IX. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE ........ 89

X. INAPPLICABILITY OF STATUTORY SAFE HARBOR ........ 90

XI. DEFENDANTS' SCHEME TO DEFRAUD ........ 91

XII. CONTROL PERSON ALLEGATIONS ........ 94

XIII. CAUSES OF ACTION ........ 96

COUNT I For Violation of § 10(b) of the Exchange Act and Rule 10b-5(b) against Defendants Zoetis, Peck and Joseph ........ 96

COUNT II For Violation of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) against All Defendants ........ 98

COUNT III For Violation of § 20(a) of the Exchange Act against the Individual Defendants ........ 100

XIV. PRAYER FOR RELIEF ........ 101

XV. JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS ........ 101

Lead Plaintiffs Nykredit Portefølje Administration A/S, acting on behalf of the entities listed in Exhibit A of its Certification (ECF No. 25-1), and Caisse de dépôt et placement du Québec (collectively, "Lead Plaintiffs") and additional plaintiff MercLan N.V. (MercLan – Defensive Portfolio, MercLan – Growth Portfolio, MercLan – Diversified Global Equity), MercLan Institutional Fund (MercLan Institutional Equity Fund DBI-RDT), and Kempen International Funds (Kempen International Funds – MercLan Global Equity, Kempen International Funds – MercLan Patrimonium) (collectively, the "MercLan/Kempen Funds" or "Additional Plaintiff," and together with Lead Plaintiffs, "Plaintiffs"), by their undersigned attorneys, bring this action under Sections 10(b) and 20(a) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, on behalf of themselves and all persons and entities who or which purchased or otherwise acquired Zoetis Inc. Securities (*see* ¶334, the operative Class Definition) during the period from January 14, 2025 through May 6, 2026, inclusive (the "Class Period") and were damaged thereby, subject to certain exclusions (the "Class"), against Defendants Zoetis, Inc. ("Zoetis" or the "Company"), Kristin Peck ("Peck"), Wetteny Joseph ("Joseph"), and Jamie Brannan ("Brannan," together with Peck and Joseph, the "Individual Defendants," and collectively with Zoetis, "Defendants").[1]

The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a

[1] Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of Zoetis during the Class Period, and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Zoetis's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); (vi) the subsidiaries and affiliates of Zoetis; and (vii) the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person, in their capacity as such.

review of: SEC filings by Zoetis; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews of former employees of Zoetis with knowledge of the matters alleged herein; and consultation with experts in the areas of accounting, loss causation, and damages.[2] Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I. SUMMARY OF THE ACTION

1. Throughout the Class Period, Defendants told investors that Zoetis's revenue growth was "driven by sustained demand" for its key products. That was false. In reality, demand had declined, and Defendants concealed that decline through an undisclosed and fraudulent channel stuffing scheme.

2. Starting in 2024, Zoetis—a company which primarily sells pharmaceutical products for pets—faced a sustained demand decline. New, cheaper competitor products were eating into Zoetis's market share for its blockbuster drugs, and Librela—a new arthritis drug that Zoetis promised would become its next blockbuster—was reportedly causing severe side effects in dogs, including seizures, neurological injury, and even death.

3. Rather than come clean and reset the market's growth expectations, Defendants engaged in an undisclosed scheme designed to hide declining demand and artificially inflate Zoetis's revenue—all so the Individual Defendants could collect millions in bonus compensation

[2] Emphasis added unless otherwise noted.

tied to 2025 revenue benchmarks. Unbeknownst to investors, the only way Defendants were able to report the revenue figures throughout 2025 was by forcing excess inventory onto the Company's distributors through incentives and concessions. This manipulative scheme, however, was knowingly unsustainable because it pulled revenue forward at the expense of future sales.

4. Critically, rather than disclose to investors the Company's reliance on these unsustainable practices, Defendants instead made affirmative false and misleading statements claiming that Zoetis's financial results were the result of organic factors. For example, throughout the Class Period, Defendants falsely assured investors that Zoetis's reported sales were "***driven by sustained demand***" for its products and that this purportedly strong demand "***drove . . . broad-based growth for [Zoetis] and double-digit growth across all of the three main key franchise[s]***." In truth, however, Zoetis met its revenue growth targets not because of strong or sustainable demand, but by pulling sales forward from future quarters, a practice that became so pervasive that, in late 2025, two internal whistleblowers reported it to the Company's compliance department, which then referred the matter to KPMG for an independent investigation.

5. Eventually, distributors' capacity to absorb excess inventory started running out, and Defendants could no longer use pull-forwards to hide declining demand. The truth was partially revealed through two disclosures—on August 5, 2025 and November 4, 2025—when Zoetis slowly disclosed lower-than-expected sales from its key franchises. Defendants still, however, refused to come clean and claimed their disclosed revenue figures came from strong demand. The full truth emerged only on May 7, 2026, when—after collecting millions in bonus compensation for 2025 reported revenue—Defendants disclosed a steep drop off in first quarter 2026 revenue and finally admitted publicly that "end market demand softened" and "distributors and retail partners took longer to work through their opening inventories and engaged in less

replenishment activity," *i.e.*, the Company's ability to keep pulling forward future sales had stopped because the distributors were left with inventory far in excess of consumer demand.

6. In response, Zoetis's stock price declined precipitously, causing investors to suffer billions of dollars in collective losses. This securities class action seeks to recover those losses on behalf of the defrauded investors.

**A. Zoetis's Business**

7. Zoetis is the world's largest producer of medicines and vaccines for animals. The Company operates through two business segments: (i) its "Companion Animal" segment, which provides products for pets such as dogs and cats; and (ii) its "Livestock" business, which provides products for farmed and working animals. The Companion Animal segment is Zoetis's primary growth driver and accounts for a majority of the Company's revenue.

8. Moreover, most of the Companion Animal segment's revenue comes from the sales of the Company's "flagship" Companion Animal drugs: (i) Simparica and Simparica Trio, oral parasiticides that protect dogs against fleas, ticks, and worms; (ii) Apoquel, an oral treatment for itching caused by allergic skin disease; and (iii) Cytopoint, an injectable treatment for the same conditions. Shortly before the start of the Class Period, Zoetis looked to extend its growth and introduced Librela, an injectable monoclonal antibody used to treat osteoarthritis pain in dogs. When Zoetis first launched Librela in 2023, Defendants repeatedly told investors that Librela would join Simparica, Apoquel, and Cytopoint as one of the Company's flagship products and revenue drivers.

9. Together, these flagship products account for roughly half of Companion Animal revenue and more than a third of Zoetis's total revenue. As Zoetis itself acknowledged, its "results of operations are dependent upon the success of our top-selling products."

10. Zoetis primarily sells its products, including its flagship products, to third-party distributors that then sell the products to the veterinary offices or end-consumers via retailers—*i.e.*, the veterinary practices that prescribe the drug or individuals who use it for their pets. Critically, Zoetis recognizes revenue when it ships product to its distributors (referred to as "sell-in" sales), not when that product is ultimately sold to veterinary offices or end-consumers (the "sell-through" sales).

11. This distinction is at the heart of this case. Because distributors ordinarily purchase only enough product to meet end-consumer demand, investors and analysts viewed Zoetis's reported revenue as a reliable reflection of underlying demand for its products. But because Zoetis books revenue the moment product leaves its warehouse, it can temporarily inflate its reported sales—without any increase in actual demand—simply by inducing distributors to take on more inventory than they need.

12. However, Defendants knew that such pull-forward practices were unsustainable and would hurt the Company's financial health long term because, by pulling sales forward from a future quarter, the Company necessarily created a hole in sales in that future quarter. The Company then needed to fill that hole with an even larger pull-forward at the end of the next quarter, and the hole kept getting deeper.

### B. Leading into the Class Period, Zoetis Faced Declining Demand from Increased Competition and Adverse Side Effects

13. In 2024, just as Zoetis was touting Librela as the next powerhouse to drive the Company's future growth, the Company started to see major declines in demand for all of its flagship drugs, including Librela.

14. First, companies began rolling out competitor drugs. In 2024, Elanco announced a drug that competed directly with Simparica Trio but was priced roughly 40% lower, as well as a

drug that competed with Apoquel. Then, in 2025, Merck announced another Apoquel competitor, as other companies began launching generic drugs that were significantly cheaper than the Company's name-brand drugs. Faced with competition from all sides, Zoetis knew internally that it was rapidly losing market share on which its growth story depended. As described below, Defendants started seeing a decline in demand starting in 2024 and worsening throughout 2025. Nonetheless, Defendants continued to lead the market to believe that demand for Simparica and Apoquel was as strong as ever and publicly denied any material impact from competition.

15. Second, as competition intensified for Zoetis's flagship products, Librela's promise of becoming another blockbuster drug began to unravel, as its dangerous side effects came to light. On April 12, 2024, *The Wall Street Journal* reported that health regulators in the United States and Europe had received thousands of reports of side effects associated with Librela, including neurological injuries and even death. Then, on December 16, 2024, the FDA issued a letter publicly warning of those serious adverse events associated with the drug. These developments sapped veterinarians' willingness to prescribe Librela and pet owners' willingness to use it. However, Defendants continued to misleadingly claim that demand for Librela was strong and downplay the impact of the negative reports on the Company's revenue figures.

### C. Internally, Defendants Knew that Demand Was Slowing

16. Behind closed doors, during forecasting meetings in 2024 about 2025 sales and revenue projections, Defendants knew that the combination of intensifying competition and Librela's safety concerns had caused demand for Zoetis's products to slow.

17. For example, FE-2 explained it was known internally around mid-2024 and discussed at Zoetis that sales and revenue were beginning to soften by the start of 2025 for three reasons: first, the Company projected that post-COVID lockdowns, families were going to slow their rate of animal adoption that had spiked during the pandemic. Second, competition across

multiple product lines was becoming stronger, citing Elanco's Credelio Quattro – which FE-2 recalled was around 40% less expensive than Zoetis's Simparica Trio – as one example. Third, FE-2 explained that sales and revenue also softened by the start of 2025 because of Librela's poor performance.

18. The drop-off in demand and expected revenue in 2025 was well known to the Individual Defendants because Zoetis employees warned them in 2024 that demand was falling. FE-6 explained that in approximately late September or early October 2024, he was part of the budget presentation for 2025 that was made to the C-suite. According to FE-6, competition was the focus of the presentation, and it detailed the negative impact that competition was going to have on Zoetis in 2025.

19. Indeed, the Company's internal forecasts for 2025, which were prepared in late 2024 and early 2025, incorporated the decline in demand that had occurred in 2024, which had been presented to the Individual Defendants during the 2025 budget presentation yet went ignored by these executives who instead wanted to present higher revenue projections to meet the market's expectations (and ensure they received their generous bonuses under the incentive based compensation plan). For example, FE-6 explained that the information discussed during the budgeting presentation was considered when producing forecasts for the fiscal year 2025 and the subsequent expectation that revenue will slow, but the response from the executive team was dismissive.

20. Similarly, according to FE-2, beginning in early 2025, he and his counterparts received and reviewed forecasts that showed declining demand due to these three factors: the slowing rate of animal adoption post-COVID lockdowns, competition across multiple product lines, and Librela's poor performance.

21. These low internal revenue forecasts—which relied on actual 2024 demand data to project declining revenue—reached the very top of the Company and were discussed during weekly meetings with Defendants Peck, Joseph, and Brannan. For example, FE-6 explained that he met weekly with Peck, Joseph, and Brannan. FE-6 noted that during the meetings he attended with Peck, Joseph, and Brannan, it was made clear to these executives that demand was down starting in the second half of Q1 2025, which they acknowledged to FE-6 and the other attendees at the meetings.

**D. Defendants Had Significant Cash Bonuses Tied to 2025 Revenue**

22. Defendants knew that the decline in demand that began in 2024 meant Zoetis's sales, and therefore its revenue, would fall off in Q4 2024 and plummet throughout 2025. That created a problem for them personally, because their annual cash bonuses were tied to Zoetis's revenue, adjusted earnings per share, and free cash flow.

23. Specifically, the Company's annual incentive plan set targets at the start of the year, including a Fiscal Year 2025 revenue target of $9.316 billion. Under the terms of that plan, Defendants Peck, Joseph, and Brannan stood to receive cash bonuses of at least $2,025,000, $800,000, and $648,000, respectively, if the Company hit the revenue benchmark, along with the benchmarks for adjusted earnings per share and free cash flow. Notably, the Individual Defendants' bonus compensation made up much of their cash compensation during the Class Period. In 2025, for example, bonuses from the annual incentive plan made up 62%, 51%, and 48% of Peck's, Joseph's, and Brannan's cash compensation, respectively.

24. However, these Individual Defendants were presented with forecasts at the beginning of the year that showed demand, and therefore sales, would be down in 2025. As former Zoetis employees confirmed, Zoetis's internal forecasts, which reflected the sharp decline in demand, showed the Company could not reach the 2025 revenue target through ordinary sales.

25. For example, according to FE-6, the lack of reality in the forecasting at Zoetis was driving so much of the pull forward activity that the executive leadership was no longer actually running a business but instead was just doing whatever was necessary to achieve the numbers they had created.

### E. Defendants Resorted to an Undisclosed and Unsustainable Scheme to Mask Declining Demand

26. Faced with this dilemma, the Individual Defendants devised an undisclosed and fraudulent scheme to hide slowing demand from investors and artificially boost 2025 reported revenue. Rather than accept that demand had declined and truthfully reset the market's expectations (as they should have), the Individual Defendants unilaterally revised these low internal sales and revenue forecasts to match what the market expected—*i.e.*, the results that would earn them their bonuses—even though those numbers were not supported by any internal demand metrics.

27. The Individual Defendants thus began to rely on unsustainable and undisclosed manipulative sales practices to meet their revenue goals, pulling sales forward and loading Zoetis's distributors with inventory that was well beyond what end-customer demand could absorb. To do this, Defendants convinced Zoetis's distributors to accept more inventory than they needed to meet sell-through demand by offering large, limited-time incentives to induce bulk purchases at the end of quarters and pressured distributors to accept additional inventory. By manipulating the timing and amount of inventory shipments, Zoetis was able to project a misleading image of sustainable revenue growth and demand.

28. Zoetis's former employees detailed that the Individual Defendants set the tone and directed the pull-forward scheme to meet their unrealistic goals by any means necessary. FE-2 stated that beginning in early 2025, Chief Commercial Officer Jamie Brannan directed him and

his commercial counterparts in other regions to alter and inflate the sales and revenue forecasts they prepared so that they would align with the Company's goals and targets. According to FE-2, Brannan received the instructions from CEO Kristin Peck and CFO Wetteny Joseph.

29. According to FE-6, the finance team's forecasts were based on actual data, whereas the commercial team's forecasts led by Brannan were based on what the street expected. Similarly, FE-2 recalled that the CFO gave everyone a target to meet and said, "This is the guidance we gave to the street, and we have to achieve everything possible to meet that guidance." FE-2 described it as a target driven by the Street, based on expectations presented to the Street, and not what was internally seen as realistic within the Company.

30. FE-2 added that the CEO and CFO deliberately chose not to disclose accurate demand signals to the market. Instead, the CEO and CFO made calculations around guidance given to the street and then adjusted forecasts and inventory to come as close as possible to match that guidance.

31. When Zoetis's financial planning team warned Defendants that actual consumer demand could not support the revenue forecast that was adjusted to meet investor expectations, they were summarily rebuffed by the Individual Defendants. For example, according to FE-6, when concerns were raised about the differences in forecasts, they were met with pushback from CFO Joseph because they were not consistent with external expectations. FE-6 added he was bringing bad news that was the truth and was grounded in data, however, he and his colleagues received dismissiveness at every stage when the forecasts with targets set internally did not align with those that needed to be achieved for the shareholders.

32. Given that decreased demand could not support the revised forecasts, the only way to hit the targets the Individual Defendants had imposed was to incentivize customers to pull in orders early. This, in turn, began cannibalizing sales for subsequent quarters.

33. For example, FE-6 recalled that the Company used promotions as a crutch in order to meet short-term sales targets. Similarly, FE-2 stated that the management team—which he identified as CEO Kristin Peck, CFO Wetteny Joseph, and CCO Jamie Brannan—pulled forward when they needed sales, and FE-2 felt the practice frustrated many people at the Company. FE-2 explained that the pull forward sales increased in 2025 as competition with Zoetis's products intensified. He reiterated that the increased competition led Zoetis to incentivize the distributors to take on inventory prematurely.

34. Therefore, at the Individual Defendants' directive, Zoetis began a scheme to pull-forward sales and revenue quarter after quarter (and ultimately from 2026 into 2025) to make Zoetis's results look better than they actually were.

### F. Defendants Made False and Misleading Statements That Hid Zoetis's Falling Demand

35. Rather than inform investors that the Company's sales figures depended on these short-term unsustainable business practices, Defendants made affirmative false and misleading statements claiming that the Company achieved its sales as a result of sustainable organic factors, such as strong demand.

36. For example, on January 14, 2025 (the first day of the Class Period), Defendant Joseph told investors that "***we see strong demand across Companion Animal***." Similarly, on February 13, 2025, Defendant Peck falsely attributed Zoetis's growth to "***the strength of our strategy and the enduring demand of our brands***," and on May 6, 2025, assured investors that

Zoetis "***continue[s] to see steady, sustainable demand for our products across species and geographies***."

37. Defendants' statements touting the purportedly strong demand were false and misleading because, in reality, demand was neither "***enduring***" nor "***sustainable***," and results were achieved, in material part, through Defendants' undisclosed manipulative business practices such as pull-forwards. At the time, Defendants knew that demand for their flagship products had declined significantly, and the Company's sales were reliant on an unsustainable scheme to induce distributors to take on more inventory than needed. By publicly assuring investors that demand was "***strong [] across Companion Animal***," and Zoetis's results came from "***enduring***" and "***sustainable***" demand, while failing to disclose the material fact that the Company had been relying on unsustainable pull forwards to meet Wall Street estimates, Defendants materially misled investors about the true nature of the Company's revenue and the demand for its Companion Animal drugs.

38. Defendants' reliance on these sales practices to artificially generate demand was inherently not "sustainable" demand. Indeed, because these practices pulled sales from future quarters, Zoetis was forced to push ever-greater amounts of inventory into its distribution channel each quarter to climb out of the ever-deeper hole it was digging.

### G. Demand Continued Declining as Defendants Engaged in More Manipulative Business Practices

39. By May 2025, after the Company's internal forecast showed that things looked even worse for the second quarter of 2025, Zoetis's commercial team leadership—the division led by Defendant Brannan, the Chief Commercial Officer—called customers to encourage them to place orders in June (the end of Q2), pulling an estimated $50 to $100 million in revenue forward from July (the start of the third quarter) into the second quarter.

40. These tactics, however, were cannibalizing future sales—a fact Defendants knew but disregarded. According to FE-1, former Senior Vice President, U.S. Petcare Marketing Rebecca Lambert sent an e-mail in approximately June or July 2025 warning that a new May promotion for Simparica Trio had "cannibalized" sales for the summer by pulling them forward. FE-1 stated he believed the e-mail was addressed to Peck and members of either Zoetis's Leadership Team or U.S. Leadership Team.

41. According to FE-1—who reviewed models used for rolling forecasts—the Company was "robbing Peter to pay Paul." FE-1 explained that the Company was not creating demand, it was just pulling forward revenue.

### H. The Truth Started to Emerge While Defendants Continued to Mislead Investors

42. Zoetis's ability to disguise its declining demand was finite. As Defendants dug the Company into deeper and deeper holes at the start of each quarter, the truth emerged through a series of disclosures as the demand shortfall began to outgrow Defendants' ability to conceal it with channel stuffing.

#### 1. August 5, 2025 – The Truth Started to be Revealed, but Defendants Continued to Mislead Investors

43. On August 5, 2025, Zoetis revealed that U.S. sales of Librela had fallen 16% to just $45 million, $7 million lower than analyst expectations, as the Company acknowledged the Librela ramp-up "has not gone according to our expectations." In response, Zoetis's stock price fell $5.69 per share, or 3.8%, in a single day.

44. Yet, Defendants continued to falsely reassure investors that Zoetis's ability to meet market expectations came from strong demand for its other flagship products. Indeed, on that day, Zoetis disclosed that the second quarter's total revenue was $2.47 billion, which beat analyst consensus of approximately $2.427 billion by just $43 million. During the earnings call to discuss

those results, Defendant Peck falsely attributed that purportedly strong reported revenue to "***sustained demand***." Similarly, during a conference on September 8, 2025, Defendant Joseph dismissed any competitive threats within the Companion Animal segment and highlighted Simparica's growing market share, stating: "***our market share, we're continuing to gain share in the space***."

45. These statements were false and misleading because the Company was losing market share, and its reported revenue was not driven by "sustained demand," but rather, an unsustainable pull-forward scheme. Indeed, by that point, demand for Simparica Trio and other flagship products was low and continuing to drop, as Zoetis had lost market share to competitors' cheaper alternatives, and Defendants were able to meet Q2 2025 numbers only by pulling forward at least $50 to $100 million in revenue from the third quarter into the second quarter.

46. For example, FE-1 recalled that in mid-May 2025, "things were not looking good" and "looked really bad." FE-1 continued to say that in an "offline conversation" he was made aware that commercial leadership had made calls to customers encouraging them to make orders for June, which resulted in $50 to $100 million in revenue being pulled forward from July to June. FE-1 explained that this put Zoetis "in a really bad hole" for Q3 2025.

47. Furthermore, FE-1—who reviewed models used for rolling forecasts—explained that he put together an analysis which had shown that Simparica Trio was down from the previous quarter of the current year as well as the same quarter from the prior year.

48. Moreover, FE-1 explained that during the Q2 2025 earnings call that Peck was "overly optimistic" and was "for sure" inaccurately optimistic about Librela and Apoquel. FE-1 continued to say that he recalled specifically that Simparica Trio had just suffered a few bad

months, and Peck claimed on the earnings call that it was gaining market share, which from his perspective was a lie.

### 2. Whistleblowers Led to Internal Investigation into Unsustainable Pull Forwards

49. By late 2025, Zoetis's pull-forward practices had become so pervasive throughout the year that two internal whistleblowers reported it to the Company's legal or compliance departments. According to FE-2, towards the end of 2025, two internal whistleblowers reported to Zoetis's legal or compliance department about possible inappropriate pull forward practices being conducted by the Company on pulling in sales for 2025 while pushing out other sales for 2026.

50. FE-2 stated this was another indication of the sales pull in practice hiding Zoetis's genuine business dynamics. FE-2 advised that Zoetis's compliance department brought this to KPMG for an independent investigation and KPMG provided findings in the form of a report that FE-2 knows for a fact was delivered to the Zoetis Board of Directors in January 2026.

51. None of this, however, was disclosed to investors. Instead, Defendants continued to hide the truth for as long as they could, hoping to report strong FY 2025 results and collect their lucrative cash bonuses. However, the truth was further partially revealed when Zoetis disclosed third quarter 2025 financial results, slowly revealing that sales of the Company's flagship products were lower than the market expected.

### 3. November 4, 2025 – The Truth Is Partially Revealed as Defendants Continued Misleading Investors

52. After several quarters of pull forwards, cracks began to show as Defendants struggled to keep up with their unsustainable and fraudulent practice. On November 4, 2025, Zoetis disclosed for the first time that its vital U.S. Companion Animal business had been flat year-over-year—a sharp decline against analyst expectations of 5% growth—and that U.S. Librela sales had declined 26% (far worse than the 16% drop the previous quarter).

53. Moreover, Zoetis was forced to cut its full-year 2025 revenue guidance from $9.45–$9.6 billion to $9.4–$9.475 billion—although, notably, this guidance was still above the 2025 guidance Zoetis issued at the start of the year and the revenue benchmark that would get Defendants their massive bonuses. In response to this unexpected news, Zoetis's stock price fell $19.89 per share, or 13.8%, in a single day.

54. Analysts, concerned by the unexpected drop in Companion Animal, pressed Defendants during the earnings call on whether the weaker-than-expected results indicated that the Company would face declining demand and lower revenue in 2026. For instance, one analyst asked "should we anticipate a continuing impact as we head into 2026?"

55. Rather than coming clean, Defendants continued to mislead investors and falsely claimed that the disappointing results Zoetis had just reported were isolated and were not indicative of any potential weaknesses moving forward. For example, during the Q3 2025 earnings call, Defendant Joseph told investors that "***we don't see the fourth quarter as an indication for 2026 in particular***," and for Librela, the Company actually saw "***signs of stabilization here, we would expect a return to growth in 2026***."

56. Defendants' statements that the weak results were an aberration, and the Company would return to growth in 2026, were false and misleading because they omitted the material fact that the Company had only achieved its reported revenue by pulling revenue forward from future quarters, including pulling forward 2026 revenue into 2025.

57. Indeed, a major driver of the Company's sales growth in Q3 (and earlier quarters), and ability to hit guidance, was driven by manipulative business practices such as pull forwards and channel stuffing that would decrease future revenue. FE-1 explained that from approximately June or July 2025 until November 2025 it was an "absolute [expletive]-show" and revenue kept

underperforming. FE-1 further explained that the Company had been "pulling forward, pulling forward" for two quarters in a row where demand was "completely diminishing." FE-1 added that the Company was not creating demand, it was just pulling forward revenue.

58. Unbeknownst to investors, this put Zoetis in a deeper and deeper hole, and once Defendants pulled enough revenue into 2025 to secure their bonuses, 2026 revenue would take a significant hit (which was eventually revealed when the Company disclosed first quarter 2026 revenue, *see infra* Section IV.L).

#### 4. Defendants Hit 2025 Revenue Benchmarks While They Continued to Falsely State That Demand Was Strong

59. On February 12, 2026, Defendants announced Zoetis's Fiscal Year 2025 results, revealing that the Company had recorded approximately $9.46 billion in revenue for the year. Notably, this reported revenue was barely above the $9.32 billion target under the annual incentive plan, which allowed the Company to award the Individual Defendants over $3.6 million in cash bonuses collectively.

60. Even still, Defendants continued misleading investors. During the Company's earnings call to discuss Fiscal Year 2025 results, Defendants continued to withhold the full truth and made affirmative misstatements claiming the 2025 results came from strong demand. For example, during the call, Defendant Peck again falsely assured investors that the demand for the Company's top-selling products had not declined, noting: "***the demand has stayed high***."

61. In reality, demand continued declining throughout 2025, and Defendants were able to deliver the reported results that year because they pulled forward a significant amount of revenue, including from 2026 into 2025. And as investors would soon learn, once Defendants pulled enough revenue into 2025 to secure their millions in cash bonuses, the full truth would be revealed when the Company announced first quarter 2026 revenue fell off a cliff.

### I. May 7, 2026 – The Full Truth Is Revealed

62. On May 7, 2026, the full truth was revealed. Zoetis reported first quarter 2026 revenue, with U.S. Companion Animal sales a staggering **$115 million** below expectations and **down 11%** as compared to first quarter 2025 results, versus consensus expectations of flat year-over-year growth.

63. In other words, the very first quarter after Defendants had barely hit their revenue benchmarks for FY 2025 and secured their lucrative bonuses—and shortly after KPMG wrapped up its investigation and provided its findings to the Board of Directors in early 2026—Defendants finally stopped their pull-forward scheme and took the hit they had been delaying for more than a year.

64. Moreover, Defendants finally admitted what they had concealed throughout the Class Period: that "distributors and retail partners took longer to work through their opening inventories and engaged in less replenishment activity," such that "sales-in to distributors and retail partners lagged their sales-out to customers." In other words, the channel stuffing had stopped as the Company's distributors needed to digest millions in excess channel inventory—meaning the distributors were stuffed with unwanted products because Zoetis had pushed on them far more than needed to satisfy demand.

65. In response, Zoetis's stock price collapsed $23.91 per share, or 21.5%, in a single day to close at $87.31 on May 7, 2026.

66. Analysts were stunned and immediately tied the stock price decline to news that Zoetis's distributors were stuffed with excess inventory. For example, J.P. Morgan reported that "US companion was the primary source of downside with inventory exacerbating the miss," estimating that distributor inventory workdowns were a "~$50-75mm headwind in the qtr."

Leerink similarly observed that "the magnitude of the miss raises questions about the trajectory of the business through the remainder of the year."

67. Analysts also criticized Defendants' lack of transparency regarding Zoetis's demand trends and distributor inventory levels, calling into question Defendants' prior false and misleading statements. For example, Morgan Stanley described Zoetis's "woefully disappointing 1Q print" as having "sent shockwaves across Animal Health," warning that "**the lack of transparency around qtr-to-qtr stocking** and subsequent 1Q destock is concerning."

68. All told, Defendants' fraud caused Zoetis's stock price to fall $88.36 per share, or roughly 50%, from its Class Period high, wiping out more than $40 billion in market capitalization value. As a result of Defendants' wrongful acts, misstatements, and omissions, Plaintiffs and members of the Class have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

69. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

70. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §1391(b), as, upon information and belief, Zoetis shareholders reside in this District, the acts and transactions giving rise to the violations of law complained of occurred in part in this District, the false and misleading statements were disseminated in and affected this District, and the manipulative conduct was carried out in part in this District.

71. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

### A. Plaintiffs

72. Lead Plaintiff Nykredit Portefølje Administration A/S ("NPA") is a regulated investment management company and Alternative Investment Fund Manager ("AIFM"), which was established in 1993 and is a 100% owned subsidiary of Nykredit Bank A/S, with approximately DKK 625 billion (USD $93.8 billion) in assets under management. NPA offers fund administration and creates value propositions for pension companies and large institutional customers, and performs functions related to the administration of both private equity funds and investment funds. As reflected in its Certification (ECF No. 25-1), NPA is acting on behalf of entities who purchased Zoetis Stock during the Class Period and suffered damages as a result of Defendants' fraud.

73. Lead Plaintiff Caisse de dépôt et placement du Québec ("La Caisse") is a global investment group established in 1965 and present in all major markets with approximately CAD $552 billion (USD $394 billion) in assets under management. La Caisse generates returns that meet the long-term needs of its depositors, and engages in activities related to portfolio construction, currency management and economic and financial analysis. As reflected in its Certification (ECF No. 25-1), La Caisse purchased Zoetis Stock during the Class Period and suffered damages as a result of Defendants' fraud.

74. Additional Plaintiff the MercLan/Kempen Funds consists of the following legal entities: (i) MercLan N.V. (MercLan – Defensive Portfolio, MercLan – Growth Portfolio, MercLan – Diversified Global Equity), which is a Belgian public limited company, qualifying as an investment company with variable capital, that contains multiple compartments or sub-funds; (ii) MercLan Institutional Fund (MercLan Institutional Equity Fund DBI-RDT), which is a Belgian public limited company, qualifying as an investment company with variable capital, that contains

a single compartment or sub-fund; and (iii) Kempen International Funds (Kempen International Funds – MercLan Global Equity and Kempen International Funds – MercLan Patrimonium), which is a Luxembourg limited liability company, qualifying as an investment company with variable capital, that contains multiple compartments or sub-funds. As reflected in the Schedule A to its Certification (ECF No. 33-2), the MercLan/Kempen Funds purchased Zoetis Stock during the Class Period and suffered damages as a result of Defendants' fraud.

### B. Defendants

#### 1. Corporate Defendant

75. Defendant Zoetis Inc. ("Zoetis") is incorporated under the laws of Delaware, with its principal executive offices located in Parsippany, New Jersey. During the Class Period, the Company's common stock ("Zoetis Stock") traded on the New York Stock Exchange ("NYSE") under the ticker symbol "ZTS." There is a large liquid market for call options to buy Zoetis Stock and put options to sell Zoetis Stock, both of which trade at prices that efficiently correspond to Zoetis's stock price. References to "Zoetis Securities" refer to Zoetis Stock and call and put options on Zoetis Stock.[3] Zoetis is a global leader in the animal health industry, focused on the discovery, development, manufacture and commercialization of medicines, vaccines, diagnostic products and services, biodevices, genetic tests and precision animal health. Zoetis sells its products in more than 100 countries and markets those products across eight core species, including companion animals (i.e., dogs, cats and horses) and livestock.

[3] Put options have essentially the same economics as call options but inverted. The inflation of Zoetis's stock price through the fraud alleged herein would injure those who sold Zoetis put options during the Class Period as those prices would be artificially deflated by the fraud. References herein to purchasing or otherwise acquiring Zoetis Securities at inflated prices and related allegations, refer to purchasing or acquiring Zoetis Stock and Zoetis call options at inflated prices, but also refer to selling Zoetis put options at deflated prices.

### 2. Individual Defendants

76. Defendant Peck has served as the Company's Chief Executive Officer ("CEO") since January 2020 and as a director since October 2019. Peck held various senior executive roles at Zoetis from October 2012 until her appointment as CEO, including most recently as Executive Vice President and Group President, U.S. Operations, Business Development and Strategy from March 2018 to December 2019. In her role as CEO of Zoetis, Peck participated in earnings calls and conferences with securities analysts, during which she made false and misleading statements and omissions of material fact concerning demand for Zoetis's products. In her role as CEO, Peck also directed the scheme to defraud investors by artificially inflating the Company's reported revenue through pull-forwards to conceal declining demand for Zoetis's Companion Animal portfolio and to meet the revenue targets under the Annual Incentive Plan.

77. Defendant Joseph was the Company's Executive Vice President and Chief Financial Officer ("CFO") from June 2021 until August 16, 2026, when the Company announced Joseph would transition to Special Advisor to the CEO on financial matters, effective August 17, 2026 until early 2027 to facilitate a smooth transition. Prior to joining Zoetis, Joseph held senior-level management roles at Catalent, Inc. ("Catalent"), including most recently as Senior Vice President and CFO from February 2018 to May 2021. In his role as CFO, Joseph participated in earnings calls and conferences with securities analysts, during which he made false and misleading statements and omissions of material fact concerning demand for Zoetis's products. In his role as CFO, Joseph also directed the scheme to defraud investors by artificially inflating the Company's reported revenue through pull-forwards to conceal declining demand for Zoetis's Companion Animal portfolio and to meet the revenue targets under the Annual Incentive Plan.

78. Defendant Brannan has served as the Company's Executive Vice President and Chief Commercial Officer ("CCO") since November 2024, leading and overseeing the Company's

commercial team. In November 2024, Defendant Brannan was appointed as the Company's Chief Commercial Officer—a newly created position that oversaw the Company's commercial operations worldwide. The press release announcing his appointment noted that as the CCO, Brannan was tasked with leading the Company's growth strategy. Prior to that, Brannan held various senior executive roles at Zoetis from 2016 until his appointment as CCO, including most recently as Executive Vice President, Group President International Operations, Aquaculture and Global Diagnostics from November 2022 to November 2024. Throughout the Class Period, and in his role as CCO, Defendant Brannan directed the scheme to defraud investors by artificially inflating the Company's reported revenue through pull-forwards to conceal declining demand for Zoetis's Companion Animal portfolio and to meet the revenue targets under the Annual Incentive Plan.

79. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control Zoetis's operations, the contents of reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors (i.e., the market), and public statements. The Individual Defendants received copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected or rendered complete, accurate, and non-misleading.

80. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from the public, and that the positive representations were materially false and/or misleading when made. The Individual Defendants are liable for the false statements pleaded herein, and their scienter is imputed to Zoetis.

**C. Relevant Third Parties**[4]

81. FE-1 was employed by Zoetis as a member of the Company's finance division from before the Class Period until the beginning of 2026. As part of his job responsibilities, FE-1 had knowledge of the Company's financial forecasts.

82. FE-2 was formerly employed by Zoetis from before the Class Period through the end of the first quarter of 2026. This included working in the commercial organization at the beginning of 2025, ultimately reporting up to CCO Jamie Brannan, and with oversight of commercial P&L (profit & loss).

83. FE-3 was employed by Zoetis for over a decade and throughout the Class Period as a Senior Account Manager. FE-3 explained that he reported to an Area Business Manager, who reported to a Territory Manager. FE-3 continued to say that he had worked with an Executive Sales Manager that had assisted him with his top 20 accounts, but there was a "big announcement" in Q4 2025 and the Company elected to remove the Executive Sales Manager role.

84. FE-4 was employed by Zoetis as an Inside Sales Representative working in the Pet Care division prior to the Class Period and in the sales division during the Class Period until his departure in May 2026. FE-4 explained he was hired in March 2022 for a project called "Go-To-Market." FE-4 further explained that Go-To-Market was a big hiring push for the Pet Care and Diagnostics divisions as the Company changed their hiring practices to allow for remote employees. According to FE-4, at this time approximately 30 to 40 Inside Sales Representatives were hired and after a year only about half remained at the Company or in that role, and at the time of his departure only a "handful" remained.

---

[4] FEs are identified herein by number (FE-1, FE-2, etc.). All FEs are described in the masculine, regardless of gender, to protect their identities.

85. FE-5 was employed by Zoetis for over a decade until December 2025 as a Senior Territory Business Manager. FE-5 explained that he was responsible for Northern Indiana during the approximately final six years of his tenure, following a restructuring that had occurred at the Company.

86. FE-6 was employed by Zoetis as a member of senior leadership from prior to the start of the Class Period and departed prior to the end of the Class Period.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Relevant Background

#### 1. Zoetis's Business

87. Zoetis is the world's largest producer of medicine and vaccines for animals. Originally a division of Pfizer, Zoetis became a separate publicly traded company in 2013. The Company operates in the United States, as well as in more than 100 other countries worldwide.

88. Zoetis's business is separated into two business segments: (i) its Companion Animal segment, its largest segment which provides products for pets such as dogs and cats; and (ii) its Livestock segment, a smaller segment which provides products for working or farmed animals. Zoetis also collects a small amount of revenue every year from contract manufacturing and human health services.

89. Zoetis's Companion Animal segment is its largest segment and primary growth driver, constituting roughly two-thirds of the Company's total revenue. For example, directly before the Class Period, the Companion Animal segment made up 68% of Zoetis's revenue in fiscal year 2024. Particularly important is the U.S. subsegment of the Company's Companion Animal business, which contributes roughly 45% of the Company's total yearly revenue. Because of the importance of the Companion Animal segment, investors carefully monitored both the U.S.

subsegment and the segment as a whole, with William Blair noting in November 2024 that Companion Animal was "the main driver of sentiment for shares[.]"

### 2. Zoetis's Distributors Are Its Primary Sales Channel

90. In addition to manufacturing and producing these products, Zoetis also distributes and sells them to its customers. Zoetis primarily sells its Companion Animal products to large third-party distributors, including MWI, Covetrus, and Patterson. These distributors are Zoetis's largest customers and largest sources of revenue. For example, sales to Zoetis's largest customer, MWI Animal Health (a U.S. veterinary distributor), represented approximately 16% of the Company's total revenue for 2025 and 14% of total revenue in 2024.[5]

91. After purchasing products from Zoetis, the distributors in turn typically sell Zoetis's products to veterinary offices (or, in some cases, retailers like Wal-Mart). These entities then prescribe or sell Zoetis's products to pet owners, *i.e.*, the end-consumers.

92. Zoetis recognizes revenue once it ships its products to the distributor, as opposed to when the distributor tenders payment or when the distributor is able to sell the product. Typically, Zoetis allows a distributor between 30 and 90 days to pay for the goods once they are received by the distributor.

93. As a result, there are two types of sales that are important to Zoetis's business. The first is "sell-in" sales, which are sales recorded when Zoetis ships its products to distributors. These types of sales are important because Zoetis recognizes revenue once a sell-in sale occurs. The second is "sell-through" sales, where a retailer or distributor sells to a veterinary office or an end-consumer. Although Zoetis does not recognize these sales as revenue (because Zoetis has already

[5] Although Zoetis primarily sells its products to distributors, it also collects a minority of revenue from sales to alternate channels, which includes shipping directly to consumers or retailers. In 2025, approximately 20% of Zoetis's sales were to these alternate channels.

transferred the products to the distributor), sell-through sales are the primary indicator of underlying demand for Zoetis's products, and thus for future revenue.

### 3. Zoetis's Flagship Products Drive Its Revenue

94. Zoetis's most important products, and the principal drivers of its revenue, were a series of pharmaceutical drugs it sold out of its Companion Animal segment. These drugs, which analysts referred to as Zoetis's "flagship" products, were the primary drivers of the Company's revenue. These flagship products included Simparica/Simparica Trio (a parasiticide), Apoquel (an oral dermatological treatment) and Cytopoint (an injectable dermatological treatment).

95. Simparica, a parasiticide, is Zoetis's highest-grossing product, single-handedly bringing in 16% of the Company's **total** revenue in 2025. The most popular formulation of Simparica is Simparica Trio, a "triple combination" parasiticide, which treats tick, flea, roundworm, hookworm, and heartworm infestation in dogs.

96. Apoquel, an oral dermatological treatment, is Zoetis's second highest grossing product, bringing in roughly 12% of the Company's total revenue in 2025. The drug treats itching, dermatitis, and inflammation in dogs.

97. Cytopoint, an injectable dermatological treatment, also treats itching and dermatitis in dogs for up to eight weeks after administration. Although Zoetis does not provide an exact percentage of the revenue Cytopoint contributes to the Company's bottom line, analysts estimate Cytopoint was responsible for roughly 6% of Zoetis's revenue in 2025.

98. Together, these products are responsible for more than a third of the Company's total revenue, and as a result, roughly half of the revenue from the Company's Companion Animal segment.

99. Part of the reason for the success of these flagship products was that historically, these products had no real competitors in the marketplace. For example, between 2020 and 2023,

Simparica Trio was the only triple combination parasiticide on the market in the United States. It was not until the company Boehringer Ingelheim launched its NexGard Plus triple combination parasiticide in 2023 that Zoetis faced any potential challenges to its market share in the United States.

100. These products, and Zoetis's near monopoly in the marketplace, drove sustained growth prior to the Class Period. From 2017 through 2024, Zoetis grew its revenue at least 5% almost every year, with the only exception being 3.9% year over year growth in 2022 (the year after a record growth year). 2024 was a particularly strong year, as the Company reported revenues of $9.26 billion—a growth rate of 8.3%.

101. Based on these results and Defendants' representations, the market expected this growth to continue. Every quarter, Zoetis reported its performance to the market, including detailing the total revenue from each of its business segments and subsegments. Zoetis also updated investors on how much it expected to collect in revenue during that fiscal year by issuing or altering its guidance.[6] Analysts, in turn, provided "consensus" estimates detailing how much revenue Zoetis was expected to report in a given quarter, based on the information provided by Defendants. Unsurprisingly, the market expected that Zoetis would accurately report sales and results that were consistent with the information it provided the market.

102. Accordingly, Defendants knew that hitting or exceeding consensus—and reporting sales and results that showed the Company was rapidly growing—was critical to the Company's stock performance, and as discussed below, their personal finances.

[6] Guidance is typically provided in a range. In considering guidance, analysts often refer to the midpoint of that range.

### 4. The Individual Defendants' Compensation Was Tied to Zoetis's Revenue

103. The Individual Defendants' compensation depended heavily on the Company's financial performance, including, among others, revenue growth. For instance, according to the Company's Proxy Statements, the Individual Defendants' compensation had three components: (i) base salary, (ii) annual cash bonuses under Zoetis's Annual Incentive Plan ("AIP"), and (iii) long-term equity awards under Zoetis's Long-Term Incentive program. Historically, performance-based pay made up more than 80% of each Individual Defendant's target compensation.

104. The Individual Defendants' cash bonuses under the AIP were based on the Company hitting certain predetermined targets. Those targets were directly tied to Zoetis's reported revenue numbers. Indeed, during the Class Period, under the AIP, reported revenue (weighted 40%) was among the most heavily weighted metrics, along with adjusted diluted earnings per share ("EPS") (weighted 40%) and free cash flow ("FCF") (weighted 20%), all of which could be inflated by increased sales. For 2025, Defendants Peck, Joseph, and Brannan were provided targets of $9.316 billion for revenue, $6.05 per share for EPS, and $2.079 billion for FCF. If they were able to hit those targets, Defendants Peck, Joseph, and Brannan stood to receive cash bonuses of $2,025,000, $800,000, and $648,000 at target, respectively.

105. Moreover, once appointed as CCO in November 2024, Defendant Brannan was—for the first time—eligible for inclusion in the Annual Incentive Plan. This meant that he stood to nearly double his cash salary for FY 2025 based on the Company's reported revenue results. Accordingly, continued reported revenue growth was critical to the Individual Defendants, not only to sustain the Company's narrative as a growth company, but also to earn their annual cash bonuses.

### B. Leading Up to the Class Period, Zoetis Announced a Revolutionary New Flagship Product

106. In 2023, Zoetis launched a new product in the United States: Librela. Zoetis repeatedly promised investors that Librela would join Simparica, Apoquel, and Cytopoint as one of its flagship products.

107. Librela is an injectable medication used to treat osteoarthritis in dogs. Librela is injected monthly by a veterinary professional, and typically requires a prescription by a veterinarian for end consumers to purchase.

108. The Company claimed that Librela would be able to tap a previously underpenetrated market for osteoarthritis drugs. For example, during its 2023 investor day in May 2023, Defendant Peck told investors that Librela would drive up to $1 billion in sales yearly, in a market that could grow as large as $2-3 billion.

109. Based on these representations, analysts labeled Librela as a future catalyst to Zoetis's success, with Morningstar proclaiming in February 2023, "[w]e anticipate Zoetis's new Librela . . . holds potential to be another blockbuster of 'human' proportions"—that is, a drug bringing in more than $1 billion in revenue every year. However, demand for Zoetis's products, including Librela, would soon begin to fall.

### C. Demand For Zoetis's Products Collapsed in 2024 Before the Class Period

110. As explained above, in the years before the Class Period, Zoetis experienced substantial growth from sales of Simparica, Apoquel, and Cytopoint, and the Company then promised investors that growth would continue with the introduction of Librela.

111. However, leading into the Class Period, Defendants saw that demand had slowed significantly for at least two reasons. First, increasing reports of serious side effects associated with Librela caused prescriptions to drop and sales to veterinary offices and end-consumers to

plummet. Second, Zoetis's competitors released a series of new products and generic drugs that directly competed with Zoetis's other products, including the flagship drugs Simparica, Apoquel, and Cytopoint. As Zoetis lost market share to these competitors, sales fell even further.

### 1. Librela's Reported Side Effects Reduced Demand for the Drug

112. Although Librela was expected to be a significant driver of sales in 2024 and 2025, it soon gained publicity for the wrong reasons. Reports of serious side effects associated with its use began emerging soon after Librela was released in U.S. markets in late 2023.

113. For instance, in early 2024, prominent news outlets began reporting that Librela was associated with severe neurological side effects. For example, on April 12, 2024, the *Wall Street Journal* released an article reporting that health regulators in both the U.S. and Europe had received thousands of reports of side effects associated with Librela. These side effects included severe neurological adverse events such as ataxia, as well as death. The Washington Post published a similar article on April 20, 2024.

114. Throughout 2024 and into the start of 2025, safety concerns associated with Librela were only amplified. On December 16, 2024, the FDA issued a "Dear Veterinarian" letter, a type of public announcement posted on the FDA website aimed at disseminating important information to veterinarians. The letter warned veterinarians of serious adverse events associated with Librela, including ataxia, seizures, and even deaths.

115. Unbeknownst to investors, these reports began to rapidly shrink consumer demand for Librela. Indeed, FEs confirmed that Zoetis knew that safety concerns limited Librela's sales. FE-2 recalled that Librela was supposed to be a "blockbuster" drug, but safety concerns tempered sales performance. FE-2 added that sales and revenue softened by the start of 2025 because of Librela's poor performance. Regarding Librela, FE-2 was aware that the Librela market in Europe got hit hard, and that the U.S.—which was the biggest market—and Australia were "struggling."

### 2. Competitors Launched New Products

116. Reports of Librela's adverse side effects were not the only headwind to demand Zoetis faced in 2024. For the first time, Zoetis began facing substantial competition, as other companies released drugs that were competing for the same customers and same market share in the areas where the Company previously held a near-monopoly.

117. For instance, prior to 2023, the only triple combination parasiticide available in the United States was Simparica Trio. However, in 2023, Boehringer Ingelheim launched its NexGard Plus triple combination parasiticide. Then, in 2024, Elanco announced the first-ever quadruple combination parasiticide, Credelio Quattro. This drug treated everything Simparica Trio did, with the addition of also treating tapeworm infestations in dogs. Furthermore, Credelio Quattro was typically priced substantially lower than Simparica Trio, which further increased its appeal to consumers.

118. Elanco also launched drugs that competed with Zoetis's other flagship products. In 2024, Elanco rolled out Zenrelia, an oral dermatological treatment that directly competed with Apoquel. Similarly, another company, Merck, announced it would release an injectable parasiticide called Bravecto Quantum in 2025 that competed with Simparica Trio and a dermatology treatment in 2026 called Numelvi that competed with Apoquel.

119. Additionally, other competitors were in position to release generic alternatives in 2025 that were cheaper than the name-brand drugs Zoetis sold. For instance, the FDA approved a generic version of Convenia, an injectable antibiotic which Zoetis had previously held a patent for, in June 2025.

120. As the market was flooded with competitor drugs that were cheaper and treated more ailments than its flagship products, Zoetis failed to protect its market share. For example,

FE-3 explained that the price wars "really heated up" when Elanco launched their competing products with Simparica Trio and Apoquel, Credelio Quattro and Zenrelia.

121. Similarly, FE-1 recalled that the Company did not have strategies for "price defense" or "market share defense." FE-1 likened Zoetis to Blockbuster Video, noting that a leadership of seemingly "really poised professionals" had "no idea what to do" once more formidable competition emerged. FE-1 added that problems at Zoetis included that people were not accepting that demand was not what they thought it was and the Company did not have the right marketing approach for "[market]share defense."

122. Regarding competition for Simparica Trio, FE-5 explained that Zoetis's approach to competition displayed "incompetence" from both the Executive and Marketing Teams. FE-5 recalled listening to investor calls in 2025 where Zoetis's executives discussed how they saw great numbers and the Company was doing great while he and his colleagues were not observing that. FE-5 further recalled that the Company was losing parasiticide (Simparica Trio) customers "left and right" and "no one" was hitting their Librela numbers. FE-5 added that it was "all sunshine" from leadership while the entire year the Company was losing market share, and he and his colleagues were seeing the Company's market share amongst their accounts going down.

### 3. Defendants Knew Demand for Zoetis's Most Important Drugs Plummeted

123. The combined effect of Librela's sales decline and increased competition for Zoetis's other flagship products caused underlying consumer demand for Zoetis's products to collapse and market share to decline. Moreover, thanks to Zoetis's close monitoring and tracking of demand indicators like sell-through sales, and their participation in meetings where declining demand was discussed, the Individual Defendants knew by late 2024 that the Company's sustained growth had ended.

124. Indeed, former employees confirm that by 2024, Zoetis had internally observed declining demand that would lead to plummeting sales in 2025.

125. For example, FE-2 explained it was known internally around mid-2024 and discussed at Zoetis, that sales and revenue were beginning to soften by the start of 2025 for three reasons: first, the Company projected that post-COVID lockdowns, families were going to slow their rate of animal adoption that had spiked during the pandemic. Second, competition across multiple product lines was becoming stronger, citing Elanco's Credelio Quattro – which FE-2 recalled was around 40% less expensive than Zoetis's Simparica Trio – as one example. Third, FE-2 added that sales and revenue softened by the start of 2025 because of Librela's poor performance.

126. Defendants also knew that the declining demand in 2024 would cause lower sales in 2025. At the end of 2024, Zoetis employees began the budgeting and forecasting process for 2025, and in so doing, factored in the declining demand the Company had already started facing in 2024. Indeed, the Individual Defendants participated in meetings where Zoetis employees explained that demand was declining due to increased competition.

127. For example, FE-6 explained that in approximately late September or early October 2024, he was part of the budget presentation for 2025 that was made to the C-suite. According to FE-6, competition was the focus of the presentation, and it detailed the negative impact that competition was going to have on Zoetis in 2025.

128. Based on those budgeting meetings, Zoetis employees prepared forecasts for 2025, which factored in the declining demand. For example, FE-6 explained that the information discussed during the budgeting presentation was considered when producing forecasts for the fiscal year 2025 and the subsequent expectation that revenue will slow, but the response from the

executive team was dismissive. Similarly, FE-2 recalled that beginning in early 2025, he and his counterparts received and reviewed forecasts that showed declining demand due to these three factors: the slowing rate of animal adoption post-COVID lockdowns, competition across multiple product lines, and Librela's poor performance.

129. The 2025 forecasts, which were based on actual data, made their way up to the Individual Defendants, who acknowledged that demand had declined. For example, FE-6 explained that he met weekly with Peck, Joseph, and Brannan. FE-6 noted that during the meetings he attended with Peck, Joseph, and Brannan, it was made clear to these executives that demand was down starting in the second half of Q1 2025, which they acknowledged to FE-6 and the other attendees at the meetings.

### D. Defendants Resorted to Undisclosed and Unsustainable Sales Practices to Mask Declining Demand and Sales

130. At the start of Fiscal Year 2025, Defendants were given a revenue benchmark: $9.316 billion. Hitting this target would achieve two purported goals. First, $9.316 billion was the target revenue under the AIP, which would provide the Individual Defendants with millions in cash bonuses. Second, the midpoint of Zoetis's FY 2025 guidance was $9.3 billion. Exceeding that midpoint—which the market expected Zoetis to achieve—was crucial to Zoetis's prospects as a public company. Hitting $9.316 billion in revenue would therefore boost both the stock price and the Individual Defendants' pocketbooks.

131. However, Defendants realized before the Class Period that falling demand starting in 2024—caused by increased competition and Librela's severe side effects—meant Zoetis would not be able to hit the revenue benchmark in 2025 through normal channels. Accordingly, Defendants needed to find a way to inflate sales and revenue. If not, they would have to disclose

that Zoetis's growth story was at an end, tank the stock, and force the Individual Defendants to forgo millions of dollars in compensation.

### 1. The Individual Defendants Refused to Truthfully Disclose Lower Demand

132. Rather than truthfully disclose to investors that demand had declined, and issue revised external revenue benchmarks that were consistent with what the internal models showed (which used actual demand data), Defendants Peck, Joseph, and Brannan began directing Zoetis employees to alter revenue forecasts, manipulating them so they were consistent with the numbers the Street expected (and the Individual Defendants needed for their compensation), even though those numbers were not based on any real-world data.

133. For example, FE-6 recalled that during meetings with executives, it was discussed how the teams were bringing down the forecasts to account for lower demand and lower market activity, and FE-6 and his team were constantly met with resistance from the Company's executives.

134. Similarly, FE-2 stated that beginning in early 2025, Chief Commercial Officer Jamie Brannan directed him and his commercial counterparts in other regions to alter and inflate the sales and revenue forecasts they prepared so that they would align with the Company's goals and targets. According to FE-2, Brannan received the instructions from CEO Kristin Peck and CFO Wetteny Joseph.

135. Likewise, FE-1 recalled that a problem at Zoetis was that the Commercial Team, including current Sr. Finance Director, US Petcare Adam Colicchio and current Finance Lead – US Livestock Hugo Arraiolos, would roll up their forecasts with FE-1's assistance and explain that projections were $X million and current EVP and Chief Commercial Officer Jamie Brannan would increase the number. FE-1 recalled Colicchio telling Brannan that they did not have

opportunities to get the number Brannan proposed. FE-1 explained that it was Brannan who was giving the Petcare team numbers it could not hit.

136. Zoetis's forecasting team made clear to the Individual Defendants that these revisions had no basis in reality and actual consumer demand would make it impossible for the Company to report the revenue the Street expected. Rather than accept this and truthfully disclose to investors that demand had declined (as they were required to do), Brannan, Joseph, and Peck ordered employees to hit the numbers no matter what, including by pulling in revenue from future quarters, which misled investors about the sustainability of Zoetis's business.

137. For example, according to FE-6, when concerns were raised about the differences in forecasts, they were met with pushback from CFO Joseph because they were not consistent with external expectations. FE-6 added he was bringing bad news that was the truth and was grounded in data, however, he and his colleagues received dismissiveness at every stage when the forecasts with targets set internally did not align with those that needed to be achieved for the shareholders.

138. Similarly, FE-2 recalled that the CFO gave everyone a target to meet and said, "This is the guidance we gave to the street, and we have to achieve everything possible to meet that guidance." FE-2 described it as a target driven by the Street, based on expectations presented to the Street, and not what was internally seen as realistic within the Company.

139. FE-2 added that the CEO and CFO deliberately chose not to disclose accurate demand signals to the market. Instead, the CEO and CFO made calculations around guidance given to the street and then adjusted forecasts and inventory to come as close as possible to match that guidance.

### 2. The Individual Defendants Hid Lower Demand Through Undisclosed, Manipulative Business Practices

140. Given that demand was declining, the only way Zoetis could possibly meet its external revenue targets was by pulling in sales and flooding the distribution channel with inventory in excess of consumer demand. Starting in 2024 and continuing throughout 2025, Defendants induced Zoetis's distributors to accept more inventory than needed to meet sell-through demand at the end of each quarter. These practices, which employees referred to as "pull-forwards," allowed Defendants to report that Zoetis had met its external revenue benchmarks and present a false image of strong consumer demand.

141. FE-2 explained that the management team—which he identified as CEO Kristin Peck, CFO Wetteny Joseph, and CCO Jamie Brannan—pulled forward when they needed sales, and FE-2 felt the practice frustrated many people at the Company. FE-2 explained this practice occurred from 2024 through 2026. However, FE-2 explained that the pull forward sales increased in 2025 as competition with their products intensified. He added that Zoetis had to pull forward sales because the Company's executives did not want to be honest with the investment community or be transparent about what the true dynamics were in the business.

142. According to FE-6, the lack of reality in the forecasting at Zoetis was driving so much of the pull forward activity that the executive leadership was no longer actually running a business but instead was just doing whatever was necessary to achieve the numbers they had created. Additionally, FE-6 recalled that the Company used promotions as a crutch in order to meet short-term sales targets.

143. Pull-forwards took several forms, typically involving incentivizing distributors to accept excess inventory. For example, according to FE-2, Zoetis sold mostly to distributors and the Company incentivized those distributors to take orders early. FE-2 reported that the Company's

pull-forward sales to distributors included selling more inventory to the distributor in the last month of the quarter than they otherwise would have by offering rebates to the distributors.

144. Similarly, FE-4 recalled that Zoetis routinely offered promotions at the end of the quarters. FE-4 continued to say that for example, the Company would offer a parasiticides promotion where practices were encouraged to "stock up" on product and were offered a rebate of 1% if they spent $10,000 that could be increased to 4% if they added another specific product, such as Librela.

145. Zoetis also leveraged its relationships with distributors, persuading them to stockpile additional inventory or to make orders earlier in order to present a misleading picture of demand. For example, FE-2 stated if the decision were made to have more revenue pulled into that quarter, they would then go to the distributor to take on more inventory, adding that they would run promotions to give discounts to take on inventory. FE-1 recalled other instances where a distributor may have, for example, 3.5 weeks of Apoquel inventory and Zoetis would call the distributor to get them to 4 or 5 weeks of inventory.

### 3. Defendants' Manipulative Sales Practices Were Unsustainable

146. Because Zoetis recorded revenue when inventory was shipped to a distributor, not when those distributors paid for the products or made sell-through sales, Zoetis was able to inflate its reported revenue numbers by manipulating the timing and amount of shipments. This disguised Zoetis's falling demand—every time Zoetis was at risk of not meeting its quarterly guidance, it convinced its distributors to take on more inventory than needed by offering concessions and other incentives so the Company could recognize revenue that quarter.

147. However, because inventory would build up at distributors faster than the distributors could "work through" the stock through sell-through sales, these practices were unsustainable. Distributors do not have infinite capacity (or willingness) to accept inventory in

excess of consumer demand: at a certain point, distributors would be unable or unwilling to accept additional products, as they would have to work through their stockpile. When that happened, Defendants could no longer use pull-forwards to inflate revenue.

148. Worse, pull-forwards (as the name suggests) pulled revenue forward from future quarters into current ones. Although pull-forwards allowed Defendants to report increased revenue by making earlier shipments, they cannibalized future sales because the distributors would have more inventory than they needed to meet demand, which caused sales during the first part of the next quarter to decline precipitously. Illustrating this, FE-6 explained that in the instances where a distributor had over-ordered they would just bleed down or slowly work through the excess inventory. FE-6 continued to say that this resulted in a revenue hit for Zoetis as the distributor needed to order less while they worked through existing inventory.

149. Because of these practices, Zoetis would start every quarter in a deeper and deeper hole, leading the Company to pull even more revenue forward in an attempt to meet that quarter's guidance. FE-1 recalled that Zoetis began every quarter starting in the hole, because they had just pulled orders into the prior quarter. Similarly, FE-2 explained that he was able to tell when the distributors took more inventory because you would see significantly less sales forecasted for that distributor for the first month of the next quarter. FE-2 added that distributors were often willing to take inventory early if incentivized, but these early orders then left Zoetis at a deficit at the beginning of the next quarter.

150. As FE-1 explained, the Company was "robbing Peter to pay Paul." According to FE-1, he voiced that while looking at the demand trends that showed that the demand for this pattern to continue was not there and that it may work some quarters but cannot continue every quarter.

### E. The Class Period Begins and Defendants Mislead Investors by Claiming Sales Are a Result of Strong Demand While Hiding Zoetis's Unsustainable Sales Practices

151. Throughout the Class Period, Defendants repeatedly told investors that Zoetis's purportedly strong results came from organic, strong, and sustainable demand, while withholding the material fact that, internally, those same Defendants had observed declining demand and were masking that decline through an unsustainable channel stuffing scheme.

152. The Class Period begins on January 14, 2025, when Defendants Peck and Joseph attended the J.P. Morgan Healthcare Conference. There, the moderator asked Defendants Peck and Joseph what was driving Zoetis's growth, specifically questioning how investors should view Librela's prospects. In response, Defendant Joseph attributed Zoetis's results across Companion Animal to the strong consumer demand the Company had supposedly been seeing, claiming "***[b]ut when we step back and look at the trends that are driving our business, we see strong demand across Companion Animal***."

153. Similarly, on February 13, 2025, Zoetis released its Q4 2024 earnings results, and during the associated earnings call that same day, Defendant Peck boasted that Zoetis had hit the high end of guidance at 11% revenue growth, attributing that growth to "***the enduring demand of our brands***."

154. Later that month, on February 27, 2025, Defendant Joseph attended the Bank of America Securities Animal Health Summit. There, Joseph told investors "***The underlying demand that we see across our portfolio starting with our companion animal portfolio drove what you saw as a broad-based growth for us . . . So, clearly the demand picture is strong for us across the landscape.***"

155. Defendants' statements attributing the Company's financial performance and revenue growth to "***enduring***" and "***strong***" demand were false and misleading because they led

investors to believe that Zoetis's reported revenue growth was driven by strong organic demand, when in truth, Defendants knew that demand was declining starting in 2024, as described in Section IV.C. Moreover, Defendants' statements were false and misleading because they withheld that Defendants hid declining demand and manufactured the appearance of demand by engaging in channel stuffing and pulling forward sales—manipulative business practices that were unsustainable and ultimately temporary.

156. Following these false and misleading statements, demand continued to plummet behind the scenes throughout 2025. For example, FE-1 explained that from April to August 2025 there were issues with demand signals and specifically recalled discussions around May 2025 revenue. FE-1 further recalled that in mid-May Zoetis does their "MRF1" or first forecast revision for the year. According to FE-1, he reviewed the rolling forecast and that mid-May's signal on sales results was "so bad," further describing it as "really bad."

157. Despite the worsening demand trends, Defendants continued to falsely reassure the market that organic demand was driving sales. On May 6, 2025, Zoetis announced its Q1 2025 results, beating revenue consensus and raising guidance to $9.425 billion-$9.575 billion—well above the revenue target under the annual incentive plan. That same day, Zoetis held an associated earnings call, again touting the Company's ability to beat consensus and raise guidance.

158. During that call, Defendant Peck bragged, "Our innovative companion animal portfolio grew 9% operationally, ***fueled by sustained demand for our diverse, market leading franchises***." She then doubled down on that claim, assuring the market that the Company "***continue[s] to see steady, sustainable demand for our products across species and geographies***."

159. The next day, May 7, 2025, Defendant Peck appeared on CNBC Closing Bell Overtime and commented on the Company's Q1 2025 earnings. During the interview, the TV host asked: "What gives you the confidence to raise guidance despite all the macro uncertainty we've been hearing about from so many different companies across so many different industries?" Defendant Peck answered: "What you saw in the quarter is 14% growth across our three largest franchises in parasiticides, dermatology, and OA pain. And ***[] what gives us the confidence is we see the underlying demand from our customers***."

160. Defendant Peck's statements were false and misleading when made because they falsely attributed the Company's strong results and revenue growth to "sustainable" demand from the Company's consumers, while omitting that the Company relied on undisclosed pull-forward sales to meet the revenue benchmarks the market expected. In truth, Defendants knew that underlying demand from consumers had declined, as described in Section IV.C. In order to hide that fact, Defendants manufactured the appearance of demand by engaging in channel stuffing and pulling forward sales—manipulative business practices that were unsustainable and ultimately temporary.

161. Analysts took Defendant Peck at her word, trusting that sustainable demand was driving the Company and not realizing that Zoetis's sales were actually driven in material part by an unsustainable channel stuffing scheme. For example, J.P. Morgan raised its price target after the earnings call, citing its understanding that "Zoetis's above-peer top-line growth . . . appear[ed] highly sustainable."

162. Defendants continued to mislead the market in subsequent public statements. For example, on May 29, 2025, Defendants attended the Stifel Jaws & Paws Conference. During the investor conference, analysts expressed concern about the Company's "near-term strategy to

reinvigorate [Librela's growth] trajectory." In response, Defendant Joseph falsely claimed: "***there is a significant demand for that profile of product to treat OA pain*** compared to what's been used historically for those that are treated, which, again, only about a third are being treated with NSAIDs. And so clearly, ***there's a significant demand for this product***."

163. Defendant Joseph's statements were false and misleading when made because they falsely claimed that there was "***significant demand***" for Librela. In truth, Defendants knew that demand for Librela had declined as safety concerns and reports of side effects had drastically cut into sales and, in order to hide that fact, Defendants manufactured the appearance of demand by engaging in channel stuffing and pulling forward sales—manipulative business practices that were unsustainable and ultimately temporary.

**F. Pull-Forwards Continued to Ramp up Through June and July 2025**

164. Demand continued to slow during the second quarter of 2025. FE-1 explained that from approximately June or July 2025 until November 2025 it was an "absolute [expletive]-show" and revenue kept underperforming.

165. To compensate for the increasingly larger sales shortfalls, Defendants turned to greater and greater pull-forwards. FE-1 continued to say that in an "offline conversation" he was made aware that commercial leadership had made calls to customers encouraging them to make orders for June, which resulted in $50 to $100 million in revenue being pulled forward from July to June. FE-1 explained that this put Zoetis "in a really bad hole" for Q3 2025.

166. Furthermore, employees warned the Individual Defendants that sales of flagship products were plummeting—and pull-forwards only worsened this issue.

167. For example, FE-1 recalled former Senior Vice President, U.S. Petcare Marketing Rebecca Lambert sending an e-mail in approximately June or July 2025 warning that a new May promotion for Simparica Trio had "cannibalized" sales for the summer by pulling them forward.

FE-1 stated he believed the e-mail was addressed to Peck and members of either Zoetis's Leadership Team or U.S. Leadership Team. FE-1 added that while he was not CC'd on the e-mail it was forwarded to him afterwards.

168. FE-1 further recalled that the e-mail came after it had become apparent that Zoetis's "hot period" for Simparica Trio was not as hot as usual and was shrinking from the year prior. FE-1 explained that he put together an analysis which had shown that Simparica Trio was down from the previous quarter of the current year as well as the same quarter from the prior year.

169. Meanwhile, during the forecast meetings, employees began to push back on Defendants' manipulation of the forecast and pull-forwards with increasing force. For example, FE-6 explained that the weekly meetings with executives became increasingly antagonistic during 2025.

### G. The Truth Began to Be Revealed While Defendants Continued to Hide the Full Extent of Their Fraud

170. By August 2025, cracks were beginning to show in Defendants' scheme, as the decline in Librela sales began to outstrip Defendants' ability to camouflage falling demand with pull forwards.

171. The first partial disclosure occurred on August 5, 2025, during Zoetis's Q2 2025 earnings results. There, the Company revealed weakening sales trends within its Companion Animal portfolio, as sales of Librela in the U.S. totaled just $45 million, a fall of 16% from the previous year. Analysts were taken aback: Jefferies labeled the Librela news as a "surprise[]," while Bank of America noted the weak Librela results were "weigh[ing] on the stock."

172. The revelation of the weakening sales trends caused Zoetis's stock price to fall. By the end of the trading day, Zoetis stock prices had tumbled $5.69 per share, or 3.8%, to close at $146.12 per share on August 5, 2025.

173. However, Defendants continued to mislead the market, asserting on the Company's associated Q2 earnings call that they continued to see "***sustained demand for our trusted, market-leading solutions***." For instance, Defendant Peck pointed to Zoetis's Simparica franchise as achieving particularly strong growth, claiming, "***demand continues to rise for comprehensive triple combination protection, the fastest growing segment in the parasiticide market*** where Simparica Trio is setting the standard of care, delivering 20% operational revenue growth."

174. These statements were false and misleading when made because Defendant Peck falsely claimed "sustained demand" was driving the Company's growth, while omitting that demand had declined, particularly in its Simparica Trio franchise, and, in order to hide that fact, Defendants manufactured the appearance of demand by engaging in channel stuffing and pulling forward sales—manipulative business practices that were unsustainable and ultimately temporary. Moreover, Defendants omitted that instead of "sustained demand," Zoetis saw its demand was plummeting.

175. Indeed, sales of the Company's flagship products were particularly weak, as competitors cut into the Company's market share. FE-1 explained that during the Q2 2025 earnings call Peck was "overly optimistic" and was "for sure" inaccurately optimistic about Librela and Apoquel. FE-1 continued to say that he recalled specifically that Simparica Trio had just suffered a few bad months, and Peck claimed on the earnings call that it was gaining market share, which from his perspective was a lie.

176. Even though the Company was losing market share and was resorting to increasingly flagrant channel stuffing to meet external guidance, Defendants only grew bolder in their misrepresentations. For example, on September 8, 2025, Defendant Joseph attended the Morgan Stanley Global Healthcare Conference. There, he continued to mislead the market about

the Company's success, asserting that ***"we see significant[ly] more room for [triple combination parasiticides] to continue to expand even as new competitors come into the space . . . [a]nd our market share, we're continuing to gain share in the space***."

177. These statements were false and misleading. Rather than "continuing to gain share," the Company was rapidly losing market share, particularly with its Simparica triple combination parasiticide, as competition with Elanco's Credelio Quattro was increasingly eating into sales. Moreover, as explained in Section IV.C, Defendant Joseph knew that demand was down for Zoetis's products, including Simparica.

### H. The Scheme Began to Unravel, Leading the Company to Cut Guidance During Its Q3 2025 Earnings Release

178. Throughout the third quarter (July 2025 through September 2025), demand for Zoetis's products continued to drop, and once again, the Company was forced to rely on channel-stuffing and pulling forward revenue to make up for low demand and hit its Q3 guidance.

179. But even with the pull forwards, when Zoetis announced its Q3 2025 results on November 4, 2025, the Company's total third quarter revenue came in under market expectations at $2.4 billion (below consensus expectation of $2.41 billion). Critically, U.S. Companion Animal revenue growth—Zoetis's most important subsegment—was particularly weak, coming in flat year over year versus expectations of 5% growth, a sharp deceleration from what Defendants had led investors to believe based on their false and misleading statements. This disclosure partially revealed the truth regarding the decline in demand for the Company's flagship products and sales shortfall the Company was facing.

180. As further evidence of the previously undisclosed decline in demand and sales headwinds the Company was facing, the Company was forced to cut its full-year guidance during its Q3 2025 earnings call, dropping its guidance from $9.450 billion-$9.600 billion to $9.400

billion-$9.475 billion, dropping the midpoint of its guidance by almost $100 million. However, even this slightly lowered guidance was above the revenue target needed under the annual incentive plan and was not truly reflective of the decline in demand Defendants had observed internally.

181. The stock price fell as a result of this disclosure, dropping $19.89 per share, or 13.8%, to close at $124.46, as Zoetis revealed that the sales weakness previously confined to Librela had spread across the entire Companion Animal portfolio.

182. Analysts expressed alarm at the surprise sales miss in Zoetis's Companion Animal segment. For example, Bank of America noted that "US Companion was especially underwhelming (flat organic) as challenges across all franchises appeared (derm deceleration, YoY declines in pain from Librela, softness in vet channels, etc.)."

**I. Defendants Continued Misleading Investors**

183. Although Defendants disclosed some of the declining sales, they still continued to hide the full magnitude of the demand shortfall Zoetis faced, as Defendants had still pulled sales into Q3 to avoid a truly catastrophic quarter and continued to use pull-forwards to meet artificial revenue targets and present a misleading view of sustainable demand.

184. Analysts were concerned by the unexpectedly poor results, particularly in Companion Animal, and pressed Defendants on whether the weak results indicated that the Company would face declining demand in 2026. For instance, one analyst asked "should we anticipate a continuing impact as we head into 2026?"

185. Rather than come clean, Defendants repeatedly told investors that the negative results Zoetis had just reported were not indicative of any potential weaknesses in 2026. For example, Defendant Joseph claimed that "***we don't see the fourth quarter as an indication for 2026 in particular***," and for Librela, the Company actually saw "***signs of stabilization here, we***

***would expect a return to growth in 2026***." Analysts accepted Defendants' representations. For instance, Jefferies concluded after the earnings call that the growth slowdown "should be temporary," and "momentum in core franchises should rebound."

186. However, Defendants' claims that the weak results were an aberration and the Company would return to growth in 2026 were false and misleading because they omitted that the Company had only achieved its reported revenue growth by pulling revenue forward from future quarters, including pulling forward 2026 revenue into 2025. Indeed, FE-1 explained that the Company had been "pulling forward, pulling forward" for two quarters in a row where demand was "completely diminishing." FE-1 added that the Company was not creating demand, it was just pulling forward revenue.

187. In turn, this pull-forward scheme put Zoetis into a deeper and deeper hole, and Defendants would have to continue pulling 2026 revenue into 2025, which would have a devastating effect on the Company's future revenue in 2026. Rather than a "***return to growth***," Zoetis was still deep in a hole it had been digging for at least three quarters, and revenue shortfalls would continue into FY 2026.

188. Indeed, Defendants knew that third quarter results had avoided disaster only because Zoetis had engaged in significant pull forwards before the end of the quarter. FE-1 explained that from approximately June or July 2025 until November 2025 it was an "absolute [expletive]-show" and revenue kept underperforming.

189. FE-1 explained that the Company had been "pulling forward, pulling forward" for two quarters in a row where demand was "completely diminishing." FE-1 added that the Company was not creating demand, it was just pulling forward revenue.

190. Similarly, FE-6 recalled that the problems at Zoetis, including forecast discrepancies, reliance on promotions, and pulling forward orders, built up all through 2025 and were filtering into the budget process for 2026. FE-6 knew that there were individuals internally that were actively pushing back on the use of pull forwards.

### J. Whistleblowers' Warnings Led to a KPMG Investigation

191. At the same time Defendants were touting the purportedly strong demand and denying that they were pushing excess inventory onto the Company's distributors, internally Zoetis was being investigated by third party KPMG for its inappropriate use of pull forwards.

192. Indeed, these unsustainable practices, which had been ongoing for several quarters, became so widespread and blatant that multiple employees came forward as whistleblowers to warn the Company's legal or compliance department of the Company's fraudulent practices. Specifically, according to FE-2, towards the end of 2025, two internal whistleblowers reported to Zoetis's legal or compliance department about possible inappropriate pull forward practices being conducted by the Company on pulling in sales for 2025 while pushing out other sales for 2026.

193. Unbeknownst to investors, Zoetis's compliance department immediately launched an investigation to be run by an independent third party, KPMG. FE-2 advised that Zoetis's compliance department brought this to KPMG for an independent investigation and KPMG provided findings in the form of a report that FE-2 knows for a fact was delivered to the Zoetis Board of Directors in January 2026. The investigation and report (or even their existence) were never publicly disclosed.

### K. The Company Reported Full Year Results, Hitting the Revenue Benchmarks While Continuing to Mislead Investors About Demand

194. On February 12, 2026, the Company announced its Q4 2025 and FY 2025 results, revealing that the Company had recorded approximately $9.46 billion in revenue for FY 2025,

meeting both guidance and the revenue target under the annual incentive plan. Due to foreign exchange adjustments, however, the $9.46 billion reported revenue was adjusted to $9.27 billion for the purposes of the annual incentive plan—just barely under the target. Regardless of this unforeseen speedbump, the Company still elected to award the Individual Defendants over 100% of their target incentive compensation.

195. Defendants continued to maintain their false story that Zoetis's reported revenue was due to the strong underlying demand the Company was supposedly still observing. For example, in response to an analyst question on whether Zoetis was seeing demand issues among consumers, Peck claimed that demand remained strong overall, asserting "***[b]ut I think as you look at the overall demand***, and I think this is important, ***the demand has stayed high***."

196. This statement was false. Defendants knew that demand had declined and, in order to hide that fact, Defendants manufactured the appearance of demand by engaging in channel stuffing and pulling forward sales—manipulative business practices that were unsustainable and ultimately temporary.

197. Indeed, the only way Zoetis had hit its revenue benchmark was, again, pulling forward massive amounts of revenue, siphoning huge amounts of sales from FY 2026 in a desperate attempt to meet the target. Indeed, FE-2 explained that when Zoetis closed out the fourth quarter of 2025, there was a huge decline in the forecast for first quarter of 2026. This suggested to FE-2 that Zoetis put more inventory in the channel at the end of 2025 to close out that fiscal year.

198. As intended, the market believed Defendants' assurances. For instance, BTIG released a report on February 26, 2026 crediting Defendants' assertions that demand would remain

strong, stating "ZTS indicated it has seen signs that Librela headwinds are stabilizing, and ZTS believes that promotional pricing from competitors is unlikely to persist for long."

**L. The Full Truth Is Revealed**

199. On May 7, 2026, the very first quarter after Defendants hit their revenue benchmarks for FY 2025 and collected millions in bonuses, Defendants finally took the hit Zoetis had delayed for more than a year. No longer able or willing to continue pulling revenue from future quarters, and at the bottom of a hole they had dug for five consecutive quarters, Defendants reported massively reduced sales in Zoetis's Companion Animal segment. These results of the concealed demand shortfall were so catastrophic that they forced Defendants to lower guidance for the **entirety** of 2026. Meanwhile, investors were left holding the bag.

200. Specifically, Zoetis released its Q1 earnings results, which revealed the full extent of the decline in demand Defendants knew about but concealed with their undisclosed scheme, as it was no longer able to compensate for the magnitude of the sales decline through pull-forward sales and other unsustainable practices. The Company reported revenue of $2.262 billion, $46 million below consensus. Worse, U.S. Companion Animal revenue for Q1 2026 was a staggering $115 million below consensus (-11% y/y).

201. The Company's revenue miss was so steep, Zoetis was forced to drastically reset its guidance for 2026 just three months after setting it, dropping it from $9.825-$10.025 billion (midpoint $9.925 billion) to $9.68-$9.96 billion (midpoint $9.820 billion).

202. Defendants finally admitted to the market that the massive revenue miss was caused by softening demand, increased competition, and, most tellingly, distributors' need to work through inventory in excess of sell-through sales. Indeed, Joseph specifically noted that "distributors and retail partners took longer to work through their opening inventories and engaged

in less replenishment activity. As a result, **sales-in to distributors and retail partners lagged their sales-out to customers[.]**"

203. Zoetis's stock price nosedived as the full extent of the demand decline and sales shortfall was disclosed to the market. By the end of the trading day, stock prices had tumbled a total of $23.91 per share, or 21.5%, to close at $87.31 per share.

204. Analysts directly linked the stock drop to the revelation of the concealed truth. Morgan Stanley warned that "ZTS's woefully disappointing 1Q print sent shockwaves across Animal Health with concerns of price wars and greater brand as well as generic competition," noting "the lack of transparency around qtr-to-qtr stocking and subsequent 1Q destock is concerning, offering incremental risk in '26 amidst competition." Morgan Stanley further noted "while distributor stocking is a component of product launch cycles and leveraging distributors can be normal operations for Animal Health companies, we are concerned by the level of volatility and lack of transparency thereon from ZTS."

205. Similarly, J.P. Morgan reported "US companion was the primary source of downside with inventory exacerbating the miss . . . distributor inventory workdowns were a ~$50-75mm headwind in the qtr (implying an underlying sales decline of ~6%)." And Leerink grimly noted "US Companion Animal growth was expected to have a substandard quarter vs. historical standards, but the magnitude of the miss raises questions about the trajectory of the business through the remainder of the year. None of the callouts—competitive pressure, wobblier macro, and generic launches—were unknown unknowns. And yet, their impacts to results in the US (and some developed markets overseas) were significantly greater than anticipated."

206. After this disclosure, the market finally understood the truth: Zoetis's demand had plummeted, sales of Librela had failed, and competition had eroded the Company's market share.

Meanwhile, all of this had been covered by the Defendants' scheme of pushing inventory on their distributors in excess of consumer demand.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

207. Plaintiffs allege that Defendants' statements highlighted in bold and italics within this section were knowingly and materially false and misleading and/or omitted to disclose material information of which Defendants were aware or were reckless in not knowing. As alleged herein, Defendants made numerous materially false and misleading public statements and omissions throughout the Class Period. Those materially false and misleading statements and omissions concerned (i) the demand for Zoetis's Companion Animal products, including Simparica, Cytopoint, Apoquel, and Librela and (ii) Defendants' reliance on manipulative business practices such as pull-forwards and channel stuffing to drive reported revenue growth.

208. As alleged herein, these statements artificially inflated or maintained the price of Zoetis Securities and operated as a fraud or deceit on all persons or entities that purchased or otherwise acquired those securities during the Class Period. Because Defendants chose to speak on the issues described below, they had a duty to fully, completely, and truthfully disclose all material facts and information necessary to provide an accurate portrayal of those issues. As described below, Defendants created an impression of a state of affairs at Zoetis that differed in a material way from the one that actually existed.

### A. January 14, 2025 – J.P. Morgan Healthcare Conference

209. On January 14, 2025, Defendants attended the J.P. Morgan Healthcare Conference. During the investor conference, Defendant Joseph touted the sustained demand he purportedly observed for the Company's Companion Animal products, noting:

> [W]e're incredibly pleased with the performance through the first three quarters of 2024, and look forward to guidance next month. ***But when we***

> ***step back and look at the trends that are driving our business, we see strong demand across Companion Animal***.

210. Defendant Joseph's statement in ¶209 was materially false and misleading when made because it attributed Zoetis's Companion Animal performance to "***strong demand***" while omitting the material facts that: (i) end-user demand for Zoetis's flagship products had already declined due to intensifying competition and Librela's safety issues, as Defendants' own internal forecasts reflected (*see supra* Section IV.C); and (ii) Zoetis's apparently robust results were achieved, in material part, through Defendants' undisclosed practice of inducing distributors to accept inventory in excess of sell-through demand at the end of each quarter through rebates, promotions, and direct pressure from commercial leadership (*see supra* Section IV.D). Having chosen to identify demand as the driver of the Company's results, Joseph was obligated to disclose the facts that rendered that attribution misleading.

211. Specifically, FE accounts demonstrate that beginning in late 2024, Defendants already saw declining demand, as sell-through sales to veterinarians and end-consumers plummeted and internal demand forecasts turned negative. *See* Section IV.C, *supra*. For example, FE-2 explained it was known internally around mid-2024 and discussed at Zoetis that sales and revenue were beginning to soften by the start of 2025 for three reasons: first, the Company projected that post-COVID lockdowns, families were going to slow their rate of animal adoption that had spiked during the pandemic. Second, competition across multiple product lines was becoming stronger, citing Elanco's Credelio Quattro – which FE-2 recalled was around 40% less expensive than Zoetis's Simparica Trio – as one example. Third, FE-2 added that sales and revenue softened by the start of 2025 because of Librela's poor performance.

212. FE-2 explained that beginning in early 2025, he and his counterparts received and reviewed forecasts that showed declining demand due to these three factors.

213. Similarly, FE-6 explained that in approximately late September or early October 2024, he was part of the budget presentation for 2025 that was made to the C-suite. According to FE-6, competition was the focus of the presentation, and it detailed the negative impact that competition was going to have on Zoetis in 2025.

214. Based on those budgeting meetings, Zoetis employees prepared forecasts for 2025, which factored in the declining demand. For example, FE-6 explained that the information discussed during the budgeting presentation was considered when producing forecasts for the fiscal year 2025 and the subsequent expectation that revenue will slow, but the response from the executive team was dismissive.

**B. February 13, 2025 – Q4 2024 Earnings Call**

215. On February 13, 2025, Zoetis released its financial results for Q4 2024. During the associated earnings call that same day, Defendant Peck touted the Company's revenue growth, stating:

> We delivered double-digit operational revenue growth of 11%, highlighting ***the strength of our strategy and the enduring demand of our brands***, and our relentless focus on execution drove broad-based growth across the business.

216. Later, an analyst questioned how the Company had positioned itself in the face of intensifying competition, asking:

> There's a lot of competition in the market this year. You already have one on the market for derm; there's a second major Apoquel competitor expected this summer. So explicitly, could you sort of walk us through what you're factoring into the guide, whether it's in terms of color for growth for those products? You kind of gave some broad comments on growth expectations, but also just sort of incremental headwinds from competition and how that could play out.

217. In response, Defendant Joseph downplayed the competition pressure and instead assured investors:

> We have multiple sources of growth. And while we're not providing individual product guidance, what we're saying is these three major franchise areas we expect to drive double-digit growth for us in 2025, and ***we see the underlying trends that drove our performance in 2024 carries into 2025 with momentum***.

218. Similarly, during the same call, another analyst asked about "the revenue cadence for 2025" as "competition will pick up in some key areas." Defendant Joseph again emphasized that the underlying demand was driving significant revenue growth, stating:

> So, look, Jon, first, on the revenue cadence, as I mentioned, ***the most important aspect here is we look at the trends that are driving our business and demand across our products and the momentum we had in 2024, we see that entering into 2025***. So, that gives us a lot of confidence and that's baked into our guidance here.

219. Defendants Peck's and Joseph's statements in ¶¶215-218 were materially false and misleading because Peck attributed Zoetis's 11% operational revenue growth to "***the strength of our strategy and the enduring demand of our brands***" and Joseph attributed the Company's 2024 performance and 2025 outlook to the "***demand across our products***," while omitting the material facts that: (i) end-user demand for Zoetis's flagship products had already declined due to intensifying competition and Librela's safety issues, as Defendants' own internal forecasts reflected (*see supra* Section IV.C); and (ii) Zoetis's apparently robust results were achieved, in material part, through Defendants' undisclosed practice of inducing distributors to accept inventory in excess of sell-through demand at the end of each quarter through rebates, promotions, and direct pressure from commercial leadership (*see supra* Section IV.D). Having chosen to identify demand as the driver of the Company's results, Defendants were obligated to disclose the facts that rendered that attribution misleading.

220. Indeed, FE accounts demonstrate that throughout the Class Period, to disguise the Company's falling demand and meet Defendants' artificial revenue targets, Defendants began inducing distributors to accept inventory well in excess of consumer demand by offering them lucrative incentives, including rebates, discounts, and promotions. *See* Section IV.D, *supra*.

221. For instance, FE-2 explained that the CEO and CFO deliberately chose not to disclose accurate demand signals to the market. Instead, the CEO and CFO made calculations around guidance given to the street and then adjusted forecasts and inventory to come as close as possible to match that guidance.

222. According to FE-2, Zoetis sold mostly to distributors and the Company incentivized those distributors to take orders early. FE-2 explained this practice occurred from 2024 through 2026.

223. However, FE-2 explained that the pull forward sales increased in 2025 as competition with their products intensified. He reiterated that the increased competition led Zoetis to incentivize the distributors to take on inventory prematurely.

224. FE-2 explained that Zoetis had to pull forward sales because the Company's executives did not want to be honest with the investment community or be transparent about what the true dynamics were in the business.

225. The statements in ¶¶215-218 were also false and misleading for the same reasons as set forth in ¶¶210-214. Specifically, FE accounts show that beginning in late 2024, Defendants were already seeing declining demand, as sell-through sales to veterinarians and end-consumers plummeted and internal demand forecasts turned negative.

**C. February 27, 2025 – BofA Securities Animal Health Summit**

226. On February 27, 2025, Defendants attended the BofA Securities Animal Health Summit. During the investor conference, an analyst asked Defendant Joseph "you guys reported

4Q results, kicked off 2025 guidance . . . what stood out to you from the quarter and what are the key things to keep in mind for 2025?" In response, Joseph again touted the strength of the demand for the Company's Companion Animal products, noting:

> I think if you look at 2024, it was an outstanding year for us, and the fourth quarter was equally outstanding. ***The underlying demand that we see across our portfolio starting with our companion animal portfolio, drove what you saw as a broad-based growth for us and double-digit growth across all of the three main key franchise areas and double-digit volume growth as well for them. So, clearly the demand picture is strong for us across the landscape***.

227. Defendant Joseph's statements in ¶226 were false and misleading for the same reasons as set forth in ¶¶219-225. Joseph stated that the "***underlying demand***" is what "***drove***" Zoetis's "***broad-based growth***" and "***double-digit growth***," while omitting the material facts that: (i) end-user demand for Zoetis's flagship products had already declined due to intensifying competition and Librela's safety issues, as Defendants' own internal forecasts reflected (*see supra* Section IV.C); and (ii) Zoetis's apparently robust results were achieved, in material part, through Defendants' undisclosed practice of inducing distributors to accept inventory in excess of sell-through demand at the end of each quarter through rebates, promotions, and direct pressure from commercial leadership (*see supra* Section IV.D). Having chosen to identify demand as the driver of the Company's results, Joseph was obligated to disclose the facts that rendered that attribution misleading.

### D. May 6, 2025 – Q1 2025 Earnings Call

228. On May 6, 2025, Zoetis released its financial results for Q1 2025. During the associated earnings call that same day, Defendants repeatedly attributed the Company's revenue growth to a sustained underlying demand. Specifically, Defendant Peck stated: "Our innovative companion animal portfolio grew 9% operationally, ***fueled by sustained demand for our diverse, market leading franchises***."

229. Defendant Peck's statement in ¶228 was false and misleading for the same reasons as set forth in ¶¶219-225. Specifically, Peck's statement misled investors because it attributed the Companion Animal portfolio's 9% operational growth to "***sustained demand for our diverse, market leading franchises,***" while omitting the material facts that: (i) end-user demand for Zoetis's flagship products had already declined due to intensifying competition and Librela's safety issues, as Defendants' own internal forecasts reflected (*see supra* Section IV.C); and (ii) Zoetis's apparently robust results were achieved, in material part, through Defendants' undisclosed practice of inducing distributors to accept inventory in excess of sell-through demand at the end of each quarter through rebates, promotions, and direct pressure from commercial leadership (*see supra* Section IV.D). Having chosen to identify demand as the driver of the Company's results, Peck was obligated to disclose the facts that rendered that attribution misleading.

230. During the same earnings call, Defendant Peck added:

> Just to summarize, we have the industry's most diverse and durable portfolio, and animal health is essential and both the industry and Zoetis have proven to be resilient across many different economic cycles and all different types of market conditions. And ***that's why we continue to see steady, sustainable demand for our products across species and geographies***.

231. Defendant Peck's statement in ¶230 was false and misleading for the same reasons as set forth in ¶¶219-225. Specifically, FE accounts show that beginning in late 2024, demand was not "steady," but rather, declining as sell-through sales to veterinarians and end-consumers plummeted and internal demand forecasts turned negative. *See* ¶¶210-214, *supra*.

**E. May 7, 2025 – CNBC Interview**

232. On May 7, 2025, Defendant Peck appeared on CNBC Closing Bell Overtime and commented on the Company's Q1 2025 earnings. During the interview, the TV host asked: "What

gives you the confidence to raise guidance despite all the macro uncertainty we've been hearing about from so many different companies across so many different industries?"

233. Defendant Peck answered: "What you saw in the quarter is 14% growth across our three largest franchises in parasiticides, dermatology, and OA pain. And ***[] what gives us the confidence is we see the underlying demand from our customers***."

234. Defendant Peck's statement in ¶233, touting the "***underlying demand***" as the reason for Zoetis's success was false and misleading for the same reasons as set forth in ¶¶219-225. In response to a direct question about the basis for raising guidance, Peck identified "***the underlying demand from our customers***" as the source of the Company's confidence, while omitting the material facts that: (i) end-user demand for Zoetis's flagship products had already declined due to intensifying competition and Librela's safety issues, as Defendants' own internal forecasts reflected (*see supra* Section IV.C); and (ii) Zoetis's apparently robust results were achieved, in material part, through Defendants' undisclosed practice of inducing distributors to accept inventory in excess of sell-through demand at the end of each quarter through rebates, promotions, and direct pressure from commercial leadership (*see supra* Section IV.D-F). Having chosen to identify demand as the driver of the Company's results, Peck was obligated to disclose the facts that rendered that attribution misleading.

**F. May 29, 2025 – Stifel Jaws & Paws Conference**

235. On May 29, 2025, Defendants attended the Stifel Jaws & Paws Conference. During the investor conference, analysts expressed concern about the Company's "near-term strategy to reinvigorate [Librela's growth] trajectory." Attempting to assure the investors, Defendant Joseph touted: "***[T]here is a significant demand for that profile of product to treat OA pain*** compared to what's been used historically for those that are treated, which, again, only about a third are being treated with NSAIDs. And so clearly, ***there's a significant demand for this product***."

236. Defendant Joseph's statement in ¶235, touting the significant demand for Librela, was false and misleading for the same reasons as set forth in ¶¶219-225. Moreover, Joseph's statements misled investors because Joseph represented that there was "***significant demand***" for Librela while omitting the material facts that Librela's adoption had fallen well short of internal expectations because of its safety issues, and that Zoetis was tying Librela purchases to promotions on its other flagship products to move inventory. *See* ¶¶112-115, 144, *supra*.

237. Indeed, as Librela became publicly associated with substantial side effects and reports of dogs killed or injured by Librela grew, veterinarians became increasingly unwilling to write prescriptions and purchases of the drug by end-consumers fell. FE-2 recalled that Librela was supposed to be a "blockbuster" drug, but safety concerns tempered sales performance. FE-2 was aware that the Librela market in Europe got hit hard, and that the U.S. – which was the biggest market – and Australia were "struggling."

238. FE-2 added that sales and revenue softened by the start of 2025 because of Librela's poor performance.

**G. August 5, 2025 – Q2 2025 Earnings Call**

239. On August 5, 2025, Zoetis released its financial results for Q2 2025. During the associated earnings call that same day, Defendant Peck again attributed the Company's revenue growth to sustained demand, noting: "Companion animal grew 8% operationally, while livestock delivered 6% organic operational growth, ***driven by sustained demand for our trusted, market-leading solutions***."

240. Defendant Peck's statement in ¶239, attributing the Company's revenue growth in the Companion Animal segment to "***sustained demand***," was false and misleading for the same reasons as set forth in ¶¶219-225. Specifically, Peck's statements misled investors because she attributed the Companion Animal segment's 8% operational growth to "***sustained demand***" while

omitting the material fact that the Company's Q2 2025 results resulted, in material part, from commercial leadership's calls to customers that pulled an estimated $50 to $100 million in July orders into June—without which Q2 2025 would have been very weak.

241. Moreover, Peck's statements omitted the material facts that: (i) end-user demand for Zoetis's flagship products had already declined due to intensifying competition and Librela's safety issues, as Defendants' own internal forecasts reflected (*see supra* Section IV.C); and (ii) Zoetis's apparently robust results were achieved, in material part, through Defendants' undisclosed practice of inducing distributors to accept inventory in excess of sell-through demand at the end of each quarter through rebates, promotions, and direct pressure from commercial leadership (*see supra* Section IV.D-G). Having chosen to identify demand as the driver of the Company's results, Peck was obligated to disclose the facts that rendered that attribution misleading.

242. Illustrating this, FE-1 recalled that in mid-May 2025, "things were not looking good" and "looked really bad." FE-1 continued to say that in an "offline conversation" he was made aware that commercial leadership had made calls to customers encouraging them to make orders for June, which resulted in $50 to $100 million in revenue being pulled forward from July to June. FE-1 explained that this put Zoetis "in a really bad hole" for Q3 2025.

243. Furthermore, in describing Q3, FE-1 explained that the Company had been "pulling forward, pulling forward" for two quarters in a row where demand was "completely diminishing." FE-1 added that the Company was not creating demand, it was just pulling forward revenue.

244. Similarly, on the same call, Defendant Peck underscored the strength of underlying demand for the Simparica franchise, stating: "Our Simparica franchise, for example, grew 17% operationally, even after nearly two years of competition. ***Demand continues to rise for***

***comprehensive triple combination protection, the fastest growing segment in the parasiticide market*** where Simparica Trio is setting the standard of care, delivering 20% operational revenue growth."

245. Defendant Peck's statement in ¶244, touting the rising demand for Simparica Trio, was false and misleading for the same reasons as set forth in ¶¶219-225. Specifically, demand was falling for Zoetis's products, including Simparica Trio, due to increased competition.

246. Furthermore, Defendant Peck's statements were false and misleading because they omitted that what sales success Zoetis reported for Simparica Trio was due in material part to Defendants' undisclosed and unsustainable practice of inducing distributors to accept inventory in excess of sell-through demand at the end of each quarter through rebates, promotions, and direct pressure from commercial leadership (*see supra* Section IV.D-G).

247. FE-1 recalled former Senior Vice President, U.S. Petcare Marketing Rebecca Lambert sending an e-mail in approximately June or July 2025 warning that a new May promotion for Simparica Trio had "cannibalized" sales for the summer by pulling them forward. FE-1 stated he believed the e-mail was addressed to Peck and members of either Zoetis's Leadership Team or U.S. Leadership Team. FE-1 added that while he was not CC'd on the e-mail it was forwarded to him afterwards.

248. FE-1 further recalled that the e-mail came after it had become apparent that Zoetis's "hot period" for Simparica Trio was not as hot as usual and was shrinking from the year prior. FE-1 explained that he put together an analysis which had shown that Simparica Trio was down from the previous quarter of the current year as well as the same quarter from the prior year.

249. FE-1 explained that during the Q2 2025 earnings call Peck was "overly optimistic" and was "for sure" inaccurately optimistic about Librela and Apoquel. FE-1 continued to say that

he recalled specifically that Simparica Trio had just suffered a few bad months, and Peck claimed on the earnings call that it was gaining market share, which from his perspective was a lie.

### H. September 8, 2025 – Morgan Stanley Global Healthcare Conference

250. On September 8, 2025, Defendants attended the Morgan Stanley Global Healthcare Conference. During the investor conference, an analyst sought an update on Simparica's market share, asking: "Where do you stand now in terms of market share? Can you talk a little bit about the competitive landscape, reorder rates, what you're seeing in terms of engagement across corporates and otherwise?"

251. In response, Defendant Joseph dismissed any competitive threat and highlighted Simparica's growing market share, stating:

> Now, if you look at triple combinations, they are about 45% – under 50% of the overall prescription parasiticides market today. It was only about 30% a year ago. So, it's growing about a 40% clip and ***we see significant more room for that to continue to expand even as new competitors come into the space*** . . . . ***And our market share, we're continuing to gain share in the space***.

252. Defendant Joseph's statements in ¶251, touting Simparica's market share, were false and misleading for the same reasons as set forth in ¶¶219-225, 242-243, 245-249. Moreover, Joseph's statements misled investors because Joseph represented that Zoetis was "***continuing to gain share***" in the market while omitting the material facts that Simparica Trio was losing share to lower-priced competitors such as Elanco's Credelio Quattro, and that the franchise's reported growth reflected pulled-forward sales rather than share gains. *See* Section IV.C-I, *supra*.

253. For example, FE-5 recalled listening to investor calls in 2025 where Zoetis's executives discussed how they saw great numbers and the Company was doing great while he and his colleagues were not observing that. FE-5 further recalled that the Company was losing parasiticide (Simparica Trio) customers "left and right" and "no one" was hitting their Librela

numbers. FE-5 added that it was "all sunshine" from leadership while the entire year the Company was losing market share, and he and his colleagues were seeing the Company's market share amongst their accounts going down.

### I. November 4, 2025 – Q3 2025 Earnings Call

254. On November 4, 2025, Zoetis released its financial results for Q3 2025. During the associated earnings call that same day, an analyst asked whether the negative results in Q3 were indicative of any weaknesses in demand headed into 2026: "And should we anticipate a continuing impact as we head into 2026?"

255. In response, Defendant Joseph denied that there was any underlying issue that would affect demand in 2026, claiming: "***I don't see how we're exiting the year and the fourth quarter to be a readthrough to what 2026 will be***" and, for Librela, "***as we see signs of stabilization here, we would expect a return to growth in 2026***." Defendant Joseph later added that "***we don't see the fourth quarter as an indication for 2026 in particular***[.]"

256. Defendant Joseph's statements in ¶255 were false and misleading for the same reasons as set forth in ¶¶219-225, 242-243, 245-249. Specifically, Defendant Joseph omitted the material fact that the Company's reported revenue growth was fueled by unsustainable pull-forwards and channel stuffing, which would result in drastically lowered sales in 2026 once Defendants ceased their scheme—as Defendants ultimately revealed on May 7, 2026.

257. Moreover, Defendant Joseph's statements omitted the material facts that: (i) end-user demand for Zoetis's flagship products had already declined due to intensifying competition and Librela's safety issues, as Defendants' own internal forecasts reflected (*see supra* Section IV.C); and (ii) Zoetis's apparently robust results were achieved, in material part, through Defendants' undisclosed practice of inducing distributors to accept inventory in excess of sell-

through demand at the end of each quarter through rebates, promotions, and direct pressure from commercial leadership (*see supra* Section IV.D-I).

258. For example, FE-1 recalled that from approximately June or July 2025 until November 2025 it was an "absolute [expletive]-show" and revenue kept underperforming. FE-1 explained that the Company had been "pulling forward, pulling forward" for two quarters in a row where demand was "completely diminishing." FE-1 added that the Company was not creating demand, it was just pulling forward revenue.

**J. February 12, 2026 – Q4 2025 Earnings Call**

259. On February 12, 2026, Zoetis released its financial results for Q4 2025. During the associated earnings call that same day, analysts again raised concerns about the demand trend for Zoetis's products, asking: "And then maybe just a macro kind of question as well, like is the commentary I'm hearing from you guys that the pet owners' financial situation is getting worse, or is it that the vet clinics raised price too much and we need to pull back on pricing increases?"

260. Defendant Peck again assured investors that the demand for the Company's top-selling products had not declined, noting:

> ***But I think as you look at the overall demand, and I think this is important, the demand has stayed high***. I think there was really just pricing at the vet clinic was taken a lot over the last three years.

261. Defendant Peck's statement in ¶260 was false and misleading for the same reasons as set forth in ¶¶219-225, 242-243, 245-249, 258. Specifically, Defendant Peck's statement omitted the material facts that: (i) end-user demand for Zoetis's flagship products had already declined due to intensifying competition and Librela's safety issues, as Defendants' own internal forecasts reflected (*see supra* Section IV.C); and (ii) Zoetis's apparently robust results were achieved, in material part, through Defendants' undisclosed practice of inducing distributors to accept inventory in excess of sell-through demand at the end of each quarter through rebates,

promotions, and direct pressure from commercial leadership (*see supra* Section IV.D-K). Having chosen to identify demand as the driver of the Company's results, Peck was obligated to disclose the facts that rendered that attribution misleading.

## VI. LOSS CAUSATION/ECONOMIC LOSS

262. Defendants' scheme, misstatements, and omissions alleged herein directly and proximately caused the economic loss (i.e., damages) suffered by Plaintiffs and the Class in violation of the federal securities laws. Throughout the Class Period, Defendants made materially false and misleading statements, half-truths, and omissions, and engaged in a scheme to defraud investors. That scheme and those misstatements and omissions artificially inflated and/or artificially maintained the price of Zoetis Securities and operated as a fraud and deceit on the Class.

263. During the Class Period, Plaintiffs and the Class relied on the integrity of the market when purchasing Zoetis Securities at artificially inflated and/or artificially maintained prices, with Zoetis's stock price reaching as high as $175.67 per share on February 5, 2025, and were damaged thereby when the stock price declined after the truth was publicly revealed and/or the risks concealed by Defendants' scheme, misrepresentations, and omissions materialized. The market for Zoetis Stock was open, well-developed, and efficient at all relevant times, with an average daily trading volume of approximately 3,675,459 shares during the Class Period.

264. As a result of the disclosure of the truth of Defendants' fraud and/or materialization of the risks through the series of disclosures described below, investors incurred billions of dollars in losses. The stock price declines during this period, including the declines summarized below, were directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by Defendants' fraudulent scheme and material misrepresentations and/or omissions. Each decline was a direct or proximate result of Defendants'

fraudulent scheme, misrepresentations and/or omissions being revealed to investors and the market.

265. The timing and magnitude of the declines in Zoetis Stock evidence the impact Defendants' scheme and statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to Defendants' fraudulent conduct.

266. Specifically, Defendants made false and misleading statements and omissions concerning (i) the demand for Zoetis's Companion Animal products, including Simparica, Cytopoint, Apoquel, and Librela, and (ii) the Company's reliance on manipulative business practices such as pull-forwards and channel stuffing to drive reported revenue growth. When Defendants' prior misrepresentations and fraudulent conduct were disclosed to investors, the price of Zoetis Stock dropped significantly.

267. Zoetis investors were injured as a result of Defendants' scheme and false statements and omissions which inflated or maintained the price of Zoetis Securities. That inflation dissipated as the true reality of the declining demand for the Company's products, including Simparica, Cytopoint, Apoquel, and Librela, was revealed through the corrective disclosures alleged herein.

268. As described below, Zoetis's scheme, misrepresentations, and omissions were revealed to the market through a series of three corrective disclosures and/or materializations of concealed risk from August 5, 2025 through May 7, 2026, inclusive. It was not until the final corrective disclosure and/or materialization of concealed risk on May 7, 2026 that the full truth was known to the market, such that there was no longer any artificial inflation and/or artificial maintenance in Zoetis's stock price attributable to the fraud. Before then, Defendants issued a

series of statements that maintained some aspect of the artificial inflation, even as other aspects of the inflation dissipated as aspects of Defendants' scheme, misrepresentations, and/or omissions were partially revealed.

### A. August 5, 2025 – First Partial Corrective Disclosure/Materialization of the Risk

269. On August 5, 2025, the relevant truth and foreseeable risks concealed by Defendants' scheme, misrepresentations, and omissions during the Class Period were partially revealed and/or materialized when Zoetis disclosed its financial results for Q2 2025, revealing the first signs of weakening demand trends within the Company's Companion Animal portfolio when sales of Librela started to decline, as the demand shortfall began to outstrip the Company's ability to pull forward revenue.

270. Specifically, Defendants disclosed that in Q2 2025, worldwide sales of Librela declined 7% on an organic operational basis. In the U.S., sales were even worse: sales of Librela declined 16% on $45 million in revenue as Defendants noted, "our ramp-up for Librela in the US has not gone according to our expectations with headwinds impacting product adoption and creating barriers for vet recommendations."

271. Defendants' August 5, 2025 disclosure concerning declining Librela sales was the foreseeable consequence of, and within the zone of risk concealed by, Defendants' scheme, misrepresentations, and/or omissions concerning (i) the demand for Zoetis's Companion Animal products, including Librela and (ii) Defendants' reliance on manipulative business practices such as pull-forwards and channel stuffing to drive reported revenue growth.

272. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Zoetis's stock price dropped $5.69 per share, or 3.8%, to close at $146.12 per share on August 5, 2025.

273. The market linked the stock price decline to Defendants' disclosure of softening demand for Librela. For example, that same day, Bank of America stated, "ZTS stock was pressured today, and is now -4% . . . We attribute the reaction largely to Librela."

274. However, Zoetis's stock price remained artificially inflated after this news because Defendants continued to falsely reassure the market that demand remained strong for its Companion Animal products overall, allowing the Company to meet its revenue targets. For instance, Defendant Peck continued to claim that the Company's reported growth was due to "***sustained demand for our trusted, market leading solutions***." *See* Section IV.G, *supra*. However, Defendants continued to withhold the relevant truth from investors: namely, demand had declined significantly, and Zoetis was only able to report the revenue results it told the street through pull-forwards.

275. Analysts were reassured by Defendants' statements. For instance, TD Cowen stated, "U.S. Librela continues to lag expectations, and ex-U.S. new patient starts are now being impacted by social media headwinds, but Zoetis remains confident in long-term outlook."

276. Similarly, William Blair reiterated that, while shares are trading 4% lower, "growth remains strong in key product portfolios like parasiticide and dermatology, driven by Simparica Trio and Apoquel/Apoquel Chewable, with upcoming growth drivers in the pipeline in 2026." Thus, William Blair "remain[ed] confident in the underlying fundamentals of the company," given management's suggestion "the potential slowdown in the second half is largely short-term from the potential for aggressive pricing/promotional tactics from new competitive entrants in the second half of the year."

### B. November 4, 2025 – Second Partial Corrective Disclosure/Materialization of the Risk

277. On November 4, 2025, further elements of the relevant truth and foreseeable risk concealed by Defendants' scheme, misrepresentations, and omissions during the Class Period were partially revealed and/or partially materialized when Zoetis disclosed its financial results for Q3 2025, when the Company disclosed slowing growth across its key Companion Animal franchises and lowered its full year sales outlook.

278. Specifically, Defendants disclosed revenue in the U.S. segment was $1.3 billion—a decrease of 2% on a reported basis compared with Q3 2024. Defendants also disclosed sales of the Company's Companion Animal products were flat for the quarter. Librela posted $41 million in revenue—a decline of 26% versus Q3 2024. Finally, Zoetis revised its full year 2025 revenue guidance to between $9.40 billion and $9.475 billion and organic operational revenue growth of 5.5% to 6.5% "based on a more measured view of macro and operational trends in the back half of the year." The midpoint of this revision was almost $100 million lower than it had been previously.

279. Defendants' November 4, 2025 disclosure concerning lower-than-expected sales in the Company's Companion Animal segment and revised guidance was the foreseeable consequence of, and within the zone of risk concealed by, Defendants' scheme, misrepresentations, and/or omissions concerning (i) the demand for Zoetis's Companion Animal products, including Simparica, Cytopoint, Apoquel, and Librela and (ii) Defendants' reliance on manipulative business practices such as pull-forwards and channel stuffing to drive reported revenue growth.

280. As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Zoetis's stock price dropped $19.89 per share, or 13.8%, to close at $124.46 per share on November 4, 2025.

281. As detailed above, analysts immediately attributed the stock price decline to the Company's disappointing announcement. For instance, William Blair commented, "[s]hares traded down more than 10% after the third-quarter earnings call due to weakness in companion animal and its implications for 2026," and that the "Librela decline was the most surprising to us . . . ." BTIG reiterated "[t]he big surprise was the slowdown in the company's US bread-and-butter companion animal health segment, which came in flat, below our +6%E, as the company cited a step-up in competitive activity on top of the 2% decline in vet clinic visits, and ZTS called out a decline in therapeutic visits which led to fewer patient starts." Morningstar highlighted "US Librela sales declined 26% year over year, driving the shares down 13% in Nov. 4 trading."

282. Similarly, Bank of America stated, "[t]he market reacted strongly to ZTS's underwhelming 3Q print . . . , with the stock declining -13% intraday (back to early 2020 lows)," and that "US Companion was especially underwhelming (flat organic) as challenges across all franchises appeared (derm deceleration, YoY declines in pain from Librela, softness in vet channels, etc.)." Likewise, Leerink Partners commented, "the magnitude of the miss and guide-down was greater than anticipated. The US Companion Animal miss, with organic growth near flat . . . was the largest area of weakness in the quarter."

283. Analysts also raised questions about competition. For example, William Blair stated, "[t]he reality is, regardless of what growth deceleration is attributed to, this level of growth will raise fears over competition and its impact on growth," while Jefferies similarly noted "[c]ommentary on share losses, promo intensity, and distributor destocking confirm that the core

is feeling pressure from competitors." Analysts also questioned the lack of visibility into the Company. For example, Morgan Stanley stated, "the latest results and guide are clearly disappointing following on the heels of a raised operational guide in 2Q, calling into question its quarter to quarter visibility around stocking and competitive dynamics."

284. Still, the Company's stock price remained artificially inflated even after this news because Defendants continued to conceal the true extent of the demand decline and the extent to which the Company's reported revenue growth was driven by Defendants' unsustainable and manipulative business practices such as channel stuffing and pull-forwards, as Zoetis had still pulled sales into Q3 to avoid a truly catastrophic quarter and continued to use pull-forwards to meet artificial revenue targets and present a misleading view of sustainable demand.

285. Meanwhile, Defendants continued to mislead investors about the extent of the scheme, reassuring the market that the negative results Zoetis had just reported were not indicative of any potential weaknesses in 2026. *See* Section IV.I, *supra*. For example, Defendant Joseph claimed that "***we don't see the fourth quarter as an indication for 2026 in particular***," and for Librela, the Company actually saw "***signs of stabilization here, we would expect a return to growth in 2026***." In truth, Defendants manufactured the appearance of demand by stuffing inventory into the Company's distributors and pulling forward sales—manipulating distributor sales in a manner that was unsustainable and would soon result in catastrophic revenue misses.

286. Analysts were again reassured by Defendants' statements but remained unaware of the truth. For instance, TD Cowen explicitly commented that "Management has high confidence in continued growth for Key Derm and Parasiticides despite near-term pressures." Similarly, HSBC Global noted, "Management indicated that actions taken are working, with signs of stabilization of in-market performance," and "Zoetis continues to operate in an attractive segment

with a long-duration growth profile, where low generics risk provides valuations support." And Jefferies stated the growth slowdown "should be temporary," and "momentum in core franchises should rebound."

**C. May 7, 2026 – Final Corrective Disclosure/Materialization of the Risk**

287. On May 7, 2026, before the market opened, the remaining aspects of the relevant truth and foreseeable risks concealed by Defendants' scheme, misrepresentations, and omissions during the Class Period were fully revealed and/or materialized when Zoetis announced its financial results for Q1 2026 and sharply reduced its full year guidance, shocking analysts. The Company disclosed slowing overall revenue growth, declining Companion Animal sales performance, and worsening results across its key dermatology, OA, and parasiticides franchises.

288. Defendants revealed flat organic operational growth in revenue for Q1 2026. Revenue in the U.S. segment was $1.1 billion—a decrease of 8% on a reported and an organic operational basis relative to Q1 2025. Defendants also disclosed sales of the Company's Companion Animal products decreased 11% and finally admitted that the decline was "**due to softer end-market demand and an increasingly competitive landscape**."

289. Defendants admitted that the Company's key dermatology franchise and Simparica Trio "faced heightened competitive pressure and persistent macroeconomic-driven price sensitivity," as well as lower sales of Librela. In the U.S., Librela reported sales of $37 million, declining 22% year-over-year. Finally, the Company revised its full year 2026 revenue guidance to between $9.68 billion and $9.96 billion and organic operational revenue growth of 2% to 5%.

290. During the associated earnings call, Defendants further admitted that "competition intensified across key pet care categories including dermatology and parasiticides" and that "these new entrants have not yet translated into overall market expansion." Defendants also admitted

that "[c]onsumer sentiment is pressuring aspects of pet owners' spend in several key markets," and "price has played a larger role in the decision process."

291. Critically, Defendants revealed that inventory capacity across different channels had been fully saturated. During the associated earnings call, Defendant Joseph noted that "distributor and retail channel purchasing patterns were also a headwind this quarter, reflecting the lower end market demand" and that "our promotions underperformed expectations and end market demand softened." Defendant Joseph added, "[D]istributors and retail partners took longer to work through their opening inventories and engaged in less replenishment activity." As a result, "sales-in to distributors and retail partners lagged their sales-out to customers."

292. Later, on the same call, Defendant Joseph further admitted that "[distributors and retailers] ordered less from us than they were shipping out to customers given the soft in-market demand and promotion that did not execute to the level we expected coming into the year. And so that certainly had a pronounced impact."

293. Defendants' May 7, 2026 disclosures concerning demand, competition, market-share loss, and distributors' over-saturation of inventory were the foreseeable consequence of, and within the zone of risk concealed by, Defendants' scheme, misrepresentations, and/or omissions concerning (i) the demand for Zoetis's Companion Animal products, including Simparica, Cytopoint, Apoquel, and Librela and (ii) Defendants' reliance on manipulative business practices such as pull-forwards and channel stuffing to drive reported revenue growth.

294. As a direct and proximate result of this corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, Zoetis's stock price dropped $23.91 per share, or 21.5%, to close at $87.31 per share on May 7, 2026.

295. Analysts were shocked and quickly connected the stock price decline to Defendants' disclosure. For example, William Blair commented, "[s]hares traded 20% lower on a first-quarter miss . . . [,]" as "management pointed to worse-than-usual competitive headwinds where new entrants are leaning into price to take share." In noting its surprises, Jefferies highlighted "[t]he magnitude of the slowdown in trends vs. 4Q. Management called out less effective promos, softer DTC/retail channel performance, generics, and competitor share gains all having an impact on results in 1Q."

296. Similarly, J.P. Morgan noted, "ZTS reported weaker than expected Q1 results and reduced 2026 guidance as competitive dynamics are having a larger impact on the company's core companion animal franchise (particularly derm). Zeroing in on US results, US companion revenues came in well below expectations[.]" The week following the Company's announcement, Morgan Stanley reiterated, "ZTS's woefully disappointing 1Q print sent shockwaves across Animal Health with concerns of price wars and greater brand as well as generic competition," and "the lack of transparency around qtr-to-qtr stocking and subsequent 1Q destock is concerning, offering incremental risk in '26 amidst competition."

## VII. ADDITIONAL INDICIA OF SCIENTER

297. At all relevant times, as alleged, the Individual Defendants acted with scienter in that they knew or recklessly disregarded that their public statements were materially false or misleading when made. In addition to the facts alleged above, Defendants' scienter is further evidenced by the following facts.

### A. Former Employees Confirm Defendants Reviewed Information Contrary to Their Public Statements

298. Numerous FE accounts confirm that the Individual Defendants were aware of and had access to information that contradicted their public statements. *See* Section IV, *supra*.

299. First, the Individual Defendants received frequent updates in late 2024 and 2025, informing them that demand was declining and would continue to decline.

300. FE-6 explained that he met weekly with Peck, Joseph, and Brannan. FE-6 further explained that while topics discussed during the weekly meetings varied, they included discussions on weekly performance, progress on initiatives, and how the Company was tracking in terms of revenue. FE-6 continued to say that it was also discussed during the meetings he attended with the Company's executives that the environment was difficult from a market standpoint and this was reflected in data related to number of vet visits, pet owner behavior, and competition.

301. FE-6 noted that during the meetings he attended with Peck, Joseph, and Brannan, it was made clear to these executives that demand was down starting in the second half of Q1 2025, which they acknowledged to FE-6 and the other attendees at the meetings.

302. Moreover, FE-6 explained that forecasts were a routine discussion on a daily and weekly basis. FE-6 further explained that in addition to the weekly meetings with Peck and Joseph, Brannan also attended Monthly Business Reviews.

303. Similarly, FE-1 recalled former Senior Vice President, U.S. Petcare Marketing Rebecca Lambert sending an e-mail in approximately June or July 2025 warning that a new May promotion for Simparica Trio had "cannibalized" sales for the summer by pulling them forward. FE-1 stated he believed the e-mail was addressed to Peck and members of either Zoetis's Leadership Team or U.S. Leadership Team. FE-1 added that while he was not CC'd on the e-mail it was forwarded to him afterwards.

304. Second, the Individual Defendants had access to or reviewed metrics and information concerning Zoetis's sales, revenue forecasts, and market share through internal systems.

305. According to FE-2, sales and forecasting information was maintained and updated in a database called Anaplan, which was used for forecasting, and the forecasts were printed and/or distributed in PowerPoint presentations for discussion and review. FE-2 advised that he reviewed his sales and financial forecasts with the CCO, who in turn reviewed them in person with CEO Kristin Peck and CFO Wetteny Joseph. FE-2 advised that he reviewed their forecasts individually with the CCO, who then reviewed them with the CEO and CFO. He recalled that the CCO, CEO, and CFO reviewed sales and revenue forecasts in person and likely on a daily basis, adding that he consistently saw the three conferring in person.

306. FE-2 added that there were daily sales reports put together and reviewed, and those numbers were then reviewed with the CCO on a daily basis, who then reviewed them with the CEO and CFO. He recalled that this daily sales report showed accumulated sales to date, and what goals needed to be met for the budget. According to FE-2, if someone had only reached 3% of their numbers (as an example) by the third week of a given month, the CCO would go to Zoetis's commercial leaders to see what is going on, which was why there was a big push to meet numbers with wholesalers and distributors the last week of the month.

307. According to FE-2, Zoetis tracked the market share of their products, including Simparica Trio and Librela. FE-2 explained that Zoetis had internal market data and reports from the marketing company CEESA that Zoetis subscribed to. He advised that the CEO and CFO had access to this sort of data. FE-2 added that there was internal knowledge that competition would have an impact on market share.

308. FE-2 explained Zoetis's U.S. team presented trends and insights from the reports they received and from CEESA in their business review to the CEO, CFO, and CCO. He added

that in his role he was directly aware that the U.S. market team incorporated those insights in their business reviews made to the C-suite.

**B. The Individual Defendants Acted With Scienter Because They Directed The Manipulative Business Practices**

309. As alleged in Section IV, *supra*, numerous FEs provide corroborating statements supporting the fact that the Individual Defendants knew about and personally directed the manipulative business practices.

310. For instance, FE-2 stated that the management team – which he identified as CEO Kristin Peck, CFO Wetteny Joseph, and CCO Jamie Brannan – pulled forward when they needed sales, and FE-2 felt the practice frustrated many people at the Company.

311. FE-6 further recalled that the Company used promotions as a crutch in order to meet short-term sales targets. According to FE-6, distributors would stock in or make purchases prior to promotions going into effect and leadership viewed this as a tool to meet targets. FE-6 further explained that the stock-ins bring a surge in revenue, which Zoetis had used to fill holes in their revenue. According to FE-6, there was a rethinking of the calendar and scale of promotions to coincide with the timing necessary to hit numbers. FE-6 explained that in the instances where a distributor had over-ordered they would just bleed down or slowly work through the excess inventory. FE-6 continued to say that this resulted in a revenue hit for Zoetis as the distributor needed to order less while they worked through existing inventory.

312. FE-2 stated that beginning in early 2025, Chief Commercial Officer Jamie Brannan directed him and his commercial counterparts in other regions to alter and inflate the sales and revenue forecasts they prepared so that they would align with the Company's goals and targets. According to FE-2, Brannan received the instructions from CEO Kristin Peck and CFO Wetteny Joseph.

313. Similarly, FE-1 recalled that a problem at Zoetis was that the Commercial Team, including current Sr. Finance Director, US Petcare Adam Colicchio and current Finance Lead – US Livestock Hugo Arraiolos, would roll up their forecasts with FE-1's assistance and explain that projections were $X million and current EVP and Chief Commercial Officer Jamie Brannan would increase the number. FE-1 recalled Colicchio telling Brannan that they did not have opportunities to get the number Brannan proposed. FE-1 explained that it was Brannan who was giving the Petcare team numbers it could not hit.

314. FE-2 advised that CEO Peck and CFO Joseph reviewed sales numbers with CCO Brannan and decided which forecasts were acceptable and which were not and suggested this was where the CEO and CFO saw opportunities for pulling orders forward. FE-2 went on to say if the decision were made to have more revenue pulled into that quarter, they would then go to the distributor to take on more inventory, adding that they would run promotions to give discounts to take on inventory.

315. According to FE-6, when concerns were raised about the differences in forecasts, they were met with pushback from CFO Joseph because they were not consistent with external expectations.

316. FE-2 recalled that the CFO gave everyone a target to meet and said, "This is the guidance we gave to the street, and we have to achieve everything possible to meet that guidance." FE-2 described it as a target driven by the Street, based on expectations presented to the Street, and not what was internally seen as realistic within the Company.

317. FE-6 recalled that the problems at Zoetis, including forecast discrepancies, reliance on promotions, and pulling forward orders, built up all through 2025 and were filtering into the budget process for 2026. According to FE-6, the lack of reality in the forecasting at Zoetis was

driving so much of the pull forward activity that the executive leadership was no longer actually running a business but instead was just doing whatever was necessary to achieve the numbers they had created.

### C. The Individual Defendants Closely Monitored Product Demand, Competition, and Inventory Levels for Each Product and Distribution Channel

318. Throughout the Class Period, Defendants repeatedly publicly admitted that they tracked and closely monitored the Company's internal metrics, including but not limited to product sales, demand, market share, and inventory levels (both at the Company and at the distributors).[7] Further, investors and analysts closely followed product demand and inventory levels within each distribution channel. They frequently questioned the Individual Defendants about these inventory dynamics, and the Individual Defendants answered with specific information about channel inventory and demand. As such, the Individual Defendants' knowledge of relevant and contrary information was evident from their public statements.

319. For instance, during the February 13, 2025 earnings call, Defendant Joseph acknowledged: "[T]he most important aspect here is we look at the trends that are driving our business and demand across our products and the momentum we had in 2024, ***we see that entering into 2025***. So, that gives us a lot of confidence and that's baked into our guidance here." Later, on the same call, Defendant Joseph reiterated that "[t]he underlying trends that we see driving for our products are entering into 2025."

320. Similarly, during the May 22, 2025 BNP Paribas Animal Health Day, an analyst asked: "[C]an you remind us the current exposure to ex-vet channel? . . . And also, if you can

---

[7] According to the Company's Form 10-Ks, as the chief operating decision makers, the Individual Defendants "use[d] the information provided to compare segment performance with segment resource requests and allocates human and capital resources based on segment's actual results and expected future results."

discuss the strength of that channel for Simparica Trio and Apoquel versus the stocking dynamics." Defendant Joseph answered: "I would say, **where we have the most visibility to what's in inventory, it's largely in the US in distribution**, right."

321. On September 8, 2025, at the Morgan Stanley Global Healthcare Conference, Defendant Joseph acknowledged that he monitored distributor inventory levels in the U.S. Specifically, Joseph said: "And as we've talked about a few times is, if you look at distributor inventories in the US, for example, those have been in the lower end of the range from what we've historically operated at since the first quarter of 2023. And in the third quarter, we've seen those trend a bit down from where they exited Q2. And so, we'll continue to monitor those as well."

322. The Individual Defendants also tracked demand levels for the Company's products in relation to competition. For example, during the January 12, 2026 J.P. Morgan Healthcare Conference, Defendant Peck admitted: "[W]e expect to grow in derm and parasiticides as we look ahead. Now, of course, we are taking into consideration the sort of the short term transitory impacts of initial launches from competitors and navigating those and executing through those, because we operate in a lot of very competitive spaces."

### D. The Sales of Simparica, Apoquel, Cytopoint, and Librela Were Critical to Zoetis's Financial Success and Market Share

323. Further bolstering Defendants' scienter is the fact that the sales of Simparica, Apoquel, Cytopoint, and Librela were critical to Zoetis's financial success and share in the Companion Animal market.

324. During the Class Period, Companion Animal products represented the majority of Zoetis's total revenue. According to the Company's SEC filings, for 2024 and 2025, approximately 68% and 70% of the Company's total revenue came from Companion Animal products, respectively.

325. Moreover, the success of the products in Companion Animal was the single most important driver of Zoetis's sales. Importantly, Zoetis acknowledged that its "results of operations are dependent upon the success of our top-selling products" because the Company's revenue is concentrated in a narrow slate of top-selling products. For example, according to the Company's SEC filings, in 2025, Simparica/Simparica Trio and Apoquel/Apoquel Chewable, the Company's two top-selling products and product lines, contributed approximately 16% and 12% of the Company's total revenue, respectively. Together with Cytopoint and Librela, these products were responsible for roughly half of the revenue the Company collects from its Companion Animal segment, and more than a third of the Company's total revenue.

326. Further, in the face of rising competition, it was critical for the Company to monitor the sales and demand for its top-selling products, including Simparica, Apoquel, Cytopoint, and Librela, and the Individual Defendants did precisely that. *See* Section IV, *supra*.

327. Given the crucial importance of the sales of Simparica, Apoquel, Cytopoint, and Librela to Zoetis's financial success, the sales figures, demand, inventory levels, and the unsustainable and manipulative business practices employed to achieve those sales were among Zoetis's most important internal metrics, a subject of intense market scrutiny and concern, and a topic on which the Individual Defendants made numerous public statements during the Class Period. As such, the Individual Defendants were aware of the practice by which the Company's core products were sold—namely, in reliance on undisclosed, unsustainable pull-in sales practices to persuade customers to accept more products than necessary.

### E. The Individual Defendants' Executive Compensation Plans Support an Inference of Scienter

328. The Individual Defendants' performance-based compensation contributes to a strong inference of scienter. According to the Company's Proxy Statements, the Individual

Defendants' compensation had three components: (i) base salary, (ii) annual cash bonuses under Zoetis's Annual Incentive Plan, and (iii) long-term equity awards under Zoetis's Long-Term Incentive program. Under Zoetis's Annual Incentive Plan ("AIP"), the bonus pool for executives was based on the Company's revenue (weighted 40%), adjusted diluted earnings per share ("EPS") (weighted 40%), and free cash flow ("FCF") (weighted 20%).

329. Notably, the Individual Defendants' bonus compensation made up much of their cash compensation during the Class Period. In 2025, for example, bonuses from the AIP made up 62%, 51%, and 48% of Peck's, Joseph's, and Brannan's monetary compensation, respectively. The Individual Defendants were thus motivated to conceal the declining demand for the Company's products and report increased revenue in FY 2025 through unsustainable pull-forward sales because their annual cash bonuses were tied directly to the Company's revenue and EPS.[8]

330. During the Class Period, Defendants' fraudulent scheme allowed them to collect over $3.6 million in cash bonuses—increasing the Individual Defendants' cash compensation by up to 162%. For the 2025 performance year, Zoetis funded the AIP at 104%-108% of its respective targets, yielding the cash payments shown in the table below:

| **Defendant** | **2025 Cash Bonus** (Paid Feb. 2026) |
|---|---|
| Peck (CEO) | $2,187,000 (108% of target and 162% of base salary) |
| Joseph (CFO) | $832,000 (104% of target and 104% of base salary) |
| Brannan (CCO) | $673,920 (104% of target and 93.6% of base salary) |
| **Total** | **$3,692,920** |

[8] The formula for calculating EPS is (Net Income – Preferred Dividends) ÷ (Weighted Average Common Shares + Dilutive Common Shares). Holding everything else constant, a higher revenue would lead to a higher net income, and accordingly, a higher EPS. Indeed, net income increased from $2.486 billion in 2024 to $2.673 billion in 2025.

331. For 2025, the reported results for revenue, adjusted EPS, and FCF were $9.467 billion, $6.41 per share, and $2.283 billion, achieving 99%, 103%, and 105% of targets, respectively and after adjustments.[9] Zoetis met its 2025 adjusted EPS target by a slim margin of 2.6% ($6.21 versus $6.05 target, or $0.16 per share). Due to a foreign exchange adjustment, the AIP result for revenue was $0.198 billion lower than the reported result, thereby barely missing its target by roughly 0.5% ($9.27 billion versus $9.32 billion target). Nonetheless, the Company still funded the bonus pool at 108% of target for Defendant Peck and 104% for Defendants Joseph and Brannan because adjusted EPS and FCF exceeded their targets, and because the Individual Defendants had supposedly achieved strong revenue growth.

332. Had the Individual Defendants reported Zoetis's true financial results without the revenue pulled forward from future periods, they would not have received the level of cash bonuses for 2025 that they did. Adjusted EPS would have fallen toward, if not below, its target, and revenue would have missed by a wider margin. Since the Individual Defendants' bonuses were tied to Zoetis's reported results, they were motivated to inflate those results.

333. Accordingly, the Individual Defendants had a direct personal financial incentive to conceal the Company's declining demand through their unsustainable channel stuffing scheme because a large portion of their compensation depended on achieving revenue targets.

---

[9] According to the Company's 2026 Proxy, for purposes of calculating 2025 annual incentive plan results, the reported results were adjusted to exclude the impact of foreign exchange rates. Historically, this adjustment raised revenue and provided a greater bonus. Ironically, the 2025 foreign exchange rates turned out to be the weakest in years, actually lowering revenue slightly below the target threshold. As a result, after adjustment, the annual incentive plan results for revenue, adjusted EPS, and FCF were $9.269 billion, $6.21 per share, and $2.193 billion, respectively.

## VIII. CLASS ACTION ALLEGATIONS

334. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who or which (1) purchased or otherwise acquired publicly traded Zoetis common stock ("Zoetis Stock") and exchange-traded call options to acquire Zoetis Stock and/or (2) sold exchange-traded put options to sell Zoetis Stock, during the period from January 14, 2025 through May 6, 2026, inclusive, and were damaged thereby, except as excluded below (the "Class").

335. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of Zoetis during the Class Period and their immediate families; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Zoetis's employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); (vi) the subsidiaries and affiliates of Zoetis; and (vii) the legal representatives, heirs, successors-in-interest, or assigns of any such excluded person, in their capacity as such.

336. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Zoetis's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of Zoetis shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Zoetis or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

337. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

338. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

339. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Zoetis;

(c) whether, and to what extent, the market price of Zoetis Stock was artificially inflated during the Class Period because of the alleged material misstatements;

(d) whether Defendants acted with the requisite level of scienter;

(e) whether the Individual Defendants were controlling persons of Zoetis; and

(f) whether the members of the Class have sustained damages because of the conduct complained of herein, and if so, the proper measure of such damages.

340. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## IX. PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

341. To the extent that Plaintiffs allege affirmative misstatements, Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations, or failed to disclose material facts required to render other statements non-misleading, during the Class Period;

(b) the misrepresentations and omissions were material;

(c) Zoetis Stock traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Zoetis Securities;

(e) Plaintiffs and other members of the Class purchased Zoetis Securities between the time Defendants misrepresented or failed to disclose material facts and disclosure of the true facts, without knowledge of the misrepresented or omitted facts;

(f) Zoetis Stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g) according to the Company's SEC Form 10-Q filed on May 7, 2026, the Company had approximately 419,228,118 shares then outstanding, demonstrating a very active and broad market for Zoetis Stock;

(h) Zoetis filed periodic public reports with the SEC;

(i) Zoetis regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national circuits of major newswire services, the internet and other wide-ranging public disclosures;

(j) Zoetis was followed by several securities analysts employed by major brokerage firms including Bank of America, Morgan Stanley, J.P. Morgan, Jefferies, and UBS, which wrote reports distributed to the sales force and customers of their respective brokerage firms, were publicly available, and entered the public marketplace;

(k) unexpected material news about Zoetis was rapidly reflected in and incorporated into the Company's stock price during the Class Period; and

(l) there were market makers for Zoetis's shares during the Class Period.

342. As a result of the foregoing, the market for Zoetis Securities promptly digested current information regarding Zoetis from publicly available sources and reflected such information in its share price. Under these circumstances, all Class members suffered similar injuries through their purchases of Zoetis Securities at artificially inflated prices and the presumption of reliance applies.

343. The material misrepresentations and omissions alleged herein would induce a reasonable investor to misjudge the value of Zoetis Securities.

344. To the extent that Defendants improperly failed to disclose material facts about Zoetis's business and/or engaged in a fraudulent scheme and course of conduct, Plaintiffs are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## X. INAPPLICABILITY OF STATUTORY SAFE HARBOR

345. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded herein. The statements alleged to be false and misleading all relate to then-existing facts and conditions. To the extent certain statements alleged to be false or misleading are determined to be mixed statements of historical or present information and future information, such statements are not

entitled to the safe harbor with respect to the part of the statement that refers to historical or present conditions.

346. To the extent certain of the statements alleged to be false or misleading may be characterized as forward looking, they were not identified as "forward-looking statements" when made and no meaningful cautionary language identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. To the extent Defendants included any cautionary language, that language was not meaningful because any potential risks identified by Defendants had already passed or manifested. As detailed herein, Defendants failed to disclose to the market that, throughout the Class Period, the Company hid weakening demand in its Companion Animal products, partly due to increased competition and reported side effects, and concealed this trend by engaging in manipulative business practices through pull-forwards and channel stuffing to create a false appearance of reported revenue growth and meet certain revenue benchmarks.

347. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for the statements because at the time each was made, they had actual knowledge it was materially false or misleading, or the statement was authorized or approved by an executive officer of Zoetis who knew the statement was false when made.

## XI. DEFENDANTS' SCHEME TO DEFRAUD

348. As alleged herein, throughout the Class Period, Defendants engaged in a deceptive scheme to conceal declining demand for Zoetis's Companion Animal portfolio and artificially inflate the Company's reported revenue through manipulative business practices such as pull-forwards and channel stuffing, so that the Individual Defendants could meet the Company's quarterly guidance and the performance targets on which their millions in cash bonuses depended.

Defendants began pulling sales forward in 2024 as demand declined beginning in late 2024, and repeatedly relied on unsustainable pull-forward sales from future quarters to meet revenue goals.

349. Because Zoetis recognized revenue upon shipment to distributors, Defendants misled investors into believing that demand for Zoetis's products remained strong. At the same time, Defendants repeatedly assured investors that Zoetis's revenue was driven by sustainable demand, while concealing that the Company's reported financial performance resulted, in material part, from the pull forward practices. Through the deceptive scheme, Defendants created a false appearance of sustainable growth and organic demand.

350. Specifically, Defendants' scheme involved: (i) inducing distributors to accept products in excess of customer demand through rebates, promotions, and other incentives; (ii) leveraging the Company's relationships with its distributors to induce them to place orders earlier than they otherwise would have; (iii) pulling those orders into the final weeks of each quarter so that they were recognized as revenue within the reporting period and enabled Zoetis to meet guidance it could not have met based on actual demand; and (iv) concealing the scheme from investors while touting the Company's growth and organic demand. *See* Section IV.C-D, *supra*.

351. Critically, as demonstrated by multiple FE accounts, each of the Individual Defendants directed and participated in the scheme. *See* Section IV.C-D, *supra*. For instance, FE-2 stated that the management team – which he identified as CEO Kristin Peck, CFO Wetteny Joseph, and CCO Jamie Brannan – pulled forward when they needed sales, and FE-2 felt the practice frustrated many people at the Company.

352. FE-2 stated that beginning in early 2025, Chief Commercial Officer Jamie Brannan directed him and his commercial counterparts in other regions to alter and inflate the sales and revenue forecasts they prepared so that they would align with the Company's goals and targets.

According to FE-2, Brannan received the instructions from CEO Kristin Peck and CFO Wetteny Joseph.

353. Similarly, FE-1 recalled that a problem at Zoetis was that the Commercial Team, including current Sr. Finance Director, US Petcare Adam Colicchio and current Finance Lead – US Livestock Hugo Arraiolos, would roll up their forecasts with FE-1's assistance and explain that projections were $X million and current EVP and Chief Commercial Officer Jamie Brannan would increase the number. FE-1 recalled Colicchio telling Brannan that they did not have opportunities to get the number Brannan proposed. FE-1 explained that it was Brannan who was giving the Petcare team numbers it could not hit.

354. FE-2 advised that CEO Peck and CFO Joseph reviewed sales numbers with CCO Brannan and decided which forecasts were acceptable and which were not and suggested this was where the CEO and CFO saw opportunities for pulling orders forward. FE-2 went on to say if the decision were made to have more revenue pulled into that quarter, they would then go to the distributor to take on more inventory, adding that they would run promotions to give discounts to take on inventory.

355. FE-6 added that the Company used promotions as a crutch in order to meet short-term sales targets. According to FE-6, distributors would stock in or make purchases prior to promotions going into effect and leadership viewed this as a tool to meet targets. FE-6 further explained that the stock-ins bring a surge in revenue, which Zoetis had used to fill holes in their revenue. According to FE-6, there was a rethinking of the calendar and scale of promotions to coincide with the timing necessary to hit numbers. FE-6 explained that in the instances where a distributor had over-ordered they would just bleed down or slowly work through the excess

inventory. FE-6 continued to say that this resulted in a revenue hit for Zoetis as the distributor needed to order less while they worked through existing inventory.

356. FE-2 recalled that the CFO gave everyone a target to meet and said, "This is the guidance we gave to the street, and we have to achieve everything possible to meet that guidance." FE-2 described it as a target driven by the Street, based on expectations presented to the Street, and not what was internally seen as realistic within the Company. According to FE-6, when concerns were raised about the differences in forecasts, they were met with pushback from CFO Joseph because they were not consistent with external expectations.

357. FE-6 recalled that the problems at Zoetis, including forecast discrepancies, reliance on promotions, and pulling forward orders, built up all through 2025 and were filtering into the budget process for 2026. According to FE-6, the lack of reality in the forecasting at Zoetis was driving so much of the pull forward activity that the executive leadership was no longer actually running a business but instead was just doing whatever was necessary to achieve the numbers they had created.

358. As intended, Defendants' scheme allowed the Company to report revenue and growth that were not supported by actual demand, which misled investors about the health and sustainability of the Company's business. Investors relied on the Company's reported revenue as a proxy for demand and were unaware that the revenue figures were inflated by Defendants' fraudulent scheme. That reported growth artificially inflated the price of Zoetis Securities. Believing that the Company's growth was sustainable and that its products enjoyed sustained demand, investors in turn purchased Zoetis Securities at artificially inflated prices.

## XII. CONTROL PERSON ALLEGATIONS

359. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in

its day-to-day operations at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements therein and omissions therefrom, and of their materially false and misleading nature.

360. The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to Zoetis during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the alleged misrepresentations and omissions.

361. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about Zoetis's business through access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly held meetings, as well as other management and Board of Directors meetings, and reports and other information provided to them in connection therewith.

362. As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Zoetis's operations and business, and to correct any previously issued statements that were or had become materially misleading or untrue, so that

the market price of Zoetis Securities would be based upon truthful and accurate information. The Individual Defendants' wrongdoing violated these specific requirements and obligations.

363. The Individual Defendants are liable as primary participants in a fraudulent scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired Zoetis Securities during the Class Period, which included, but was not limited to, the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions) concerning (i) demand for Zoetis's Companion Animal products, including Simparica, Cytopoint, Apoquel, and Librela and (ii) the Company's reliance on manipulative business practices such as pull-forwards and channel stuffing to drive reported revenue growth.

364. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Zoetis, were acting on behalf of the Company in the regular course of business. Therefore, each statement made by the Individual Defendants during the Class Period is attributable to the Company.

## XIII. CAUSES OF ACTION

### COUNT I

### For Violation of § 10(b) of the Exchange Act and Rule 10b-5(b) against Defendants Zoetis, Peck and Joseph

365. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

366. This Count is asserted on behalf of all members of the Class against Defendants Zoetis, Peck, and Joseph, for violations of § 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

367. As alleged herein, throughout the Class Period, Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading and carried out a plan, scheme and course of conduct, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially manipulate the price of Zoetis Securities; and (iii) cause Plaintiffs and members of the Class to purchase Zoetis Securities at artificially inflated prices.

368. Defendants Peck and Joseph were individually and collectively responsible for making the false and misleading statements and omissions alleged herein and engaging in a plan, scheme, and course of conduct designed to deceive Plaintiffs and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

369. As set forth above, Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Class who purchased Zoetis Securities during the Class Period.

370. In ignorance of the false and misleading nature of Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Zoetis Securities, Plaintiffs and other members of the Class purchased Zoetis Securities at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and members of

the Class would not have purchased Zoetis Securities at such artificially inflated prices. As set forth herein, when the true facts were subsequently disclosed, the stock price declined precipitously, and Plaintiffs and members of the Class were damaged and harmed as a direct and proximate result of their purchases at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

371. By virtue of the foregoing, Defendants are liable to Plaintiffs and members of the Class for violations of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**COUNT II**

**For Violation of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) against All Defendants**

372. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

373. This Count is asserted on behalf of all members of the Class against Defendants Zoetis, Peck, Joseph, and Brannan for violations of § 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

374. This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c). Accordingly, Plaintiffs need not allege nor prove that any Defendants made misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

375. As alleged herein, during the Class Period, Defendants carried out a common plan, scheme, and fraudulent course of conduct that was intended to, and did: (i) deceive the investing public, including Plaintiffs and the Class; (ii) artificially inflate the price of Zoetis Securities; and (iii) cause Plaintiffs to purchase Zoetis Securities at artificially inflated prices.

376. Defendants' fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of business included the knowing and/or reckless suppression and concealment of information regarding weakening demand in its Companion Animal products, partly due to increased competition, and concealment of this trend by engaging in a scheme to pull forward revenue to create a false appearance of reported revenue growth. This scheme was designed to artificially hit revenue benchmarks, misleading the market into believing that Zoetis was experiencing sustainable growth and allowing the Individual Defendants to receive exorbitant bonuses.

377. In furtherance of this fraudulent plan, scheme, and course of conduct, Defendants employed devices, schemes, and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiffs and the Class in connection with their purchases of Zoetis Securities, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder.

378. Plaintiffs and the Class reasonably relied upon the integrity of the market in which Zoetis Securities traded.

379. During the Class Period, Plaintiffs and the Class were unaware of Defendants' fraudulent scheme and course of conduct and/or the impact of the fraudulent scheme. Had Plaintiffs and the Class known of Defendants' fraudulent scheme and course of conduct, they would not have purchased Zoetis Securities, or if they had, would not have done so at the artificially inflated prices paid for such securities.

380. As a direct and proximate result of Defendants' scheme to defraud and such course of conduct, Plaintiffs and the Class suffered damages in connection with their purchases of Zoetis Securities during the Class Period.

381. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiffs and the Class for damages suffered in connection with their purchases of Zoetis Securities during the Class Period.

**COUNT III**

**For Violation of § 20(a) of the Exchange Act against the Individual Defendants**

382. Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

383. This Count is asserted on behalf of all members of the Class against the Individual Defendants for violation of § 20(a) of the Exchange Act.

384. The Individual Defendants had control over Zoetis and/or made the materially false and misleading statements and omissions on behalf of Zoetis within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their executive positions and their culpable participation in the fraud, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

385. The Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein. Additionally, to the extent necessary, the Individual Defendants actually exercised control

over Zoetis, including by, among other things, directing the Company to issue materially false and misleading statements to the investing public in group-published and other materials.

386. By reason of such wrongful conduct, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with purchasing the Company's securities during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A. Determining that this action is a proper class action, and certifying Plaintiffs as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel for the Class;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

## XV. JURY TRIAL DEMAND APPLICABLE TO ALL CLAIMS

Plaintiffs demand a trial by jury.

DATED: October 23, 2026

Respectfully submitted,

*/s/ Michael P. Canty*

**LABATON KELLER SUCHAROW LLP**
Michael P. Canty
James T. Christie
Nicholas D. Manningham
Stephen C. Boscolo

140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
mcanty@labaton.com
jchristie@labaton.com
nmanningham@labaton.com
sboscolo@labaton.com

*Lead Counsel for Lead Plaintiffs Nykredit Portefølje Administration A/S and Caisse de dépôt et placement du Québec and the Proposed Class*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Jacob Lieberman (Notice of Appearance forthcoming)
Marc Greco (Notice of Appearance forthcoming)
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
jlieberman@scott-scott.com
mgreco@scott-scott.com

*Additional Counsel for the MercLan/Kempen Funds*